## No. 2733.

### Juan Navarro *v.* The State.

1. ABORTION—INDICTMENT.—See the statement of the case for an indict
   ment *held* sufficient to charge the offense of producing an abortion by
   an unlawful assault upon a pregnant woman.
2. SAME—PRACTICE—EVIDENCE.—In a prosecution for producing an abor-
   tion by an unlawful and violent assault, the injured female, although
   the wife of the accused, is a competent witness against him.
3. SAME—EXPERT TESTIMONY.—The prosecutrix in this case, having testi-
   fied to the violence inflicted upon her by the accused, was also permitted
   to testify to her subsequent delivery of two dead children, to the con-
   dition of the bodies, and, without first being qualified as an expert, to
   the fact that the abortion was the result of the violence inflicted upon
   her by the accused. *Held,* that the evidence was improperly admitted,.
   under the rule that when "a claimed result becomes so remote that con-
   clusion and deduction are necessary to connect it with a cause, the non-
   expert witness can only state physical facts, leaving the conclusions to
   be drawn by the jury." This error, however, would, in this case, have
   been immaterial had the witness stated the facts upon which the opinion
   was based.
4. PRACTICE—LEADING QUESTIONS are permissible, even on direct examina-
   tion, if the witness appears to be hostile to the party producing him, or
   is in the interest of the other party, or unwilling to give evidence. Note
   the opinion for a case in which, the witness coming within each of the
   exceptions to the general rule, her testimony was properly admitted.

APPEAL from the District Court of Cameron. Tried below be-
fore the Hon. J. C. Russell.

A term of four years in the penitentiary was assessed against
the appellant upon his conviction under an indictment, the
charging part of which reads as follows: * * * "That Juan
Navarro, on or about the fifteenth day of June, 1887, in Cameron
county, Texas, in and upon Manuela Rodriguez, a woman, then
and there pregnant, did make an assault, and did then and there
unlawfully, willfully and designedly, without the consent of the
said Manuela Rodriguez, procure an abortion by then and there
striking, kicking, and violently using the person of her, the
said Manuela Rodriguez, during her said pregnancy."

Manuela Rodriguez was the first witness for the State. She
testified that she lived in Brownsville, Cameron county, Texas,

and was the wife of the defendant, and the alleged injured party. On or about June 15, 1887, the defendant, who was then in jail, sent the witness to see a lawyer for him. Witness did not return to the jail on that day, and when she did return, the defendant, who was jealous of her, accused her of sleeping with the lawyer, and kicked her on her abdomen. He then said that he was sorry, and that the witness could do with him as she pleased. Questions elicited from the witness the statement that, just before kicking her, the defendant said: "If that is my child, put it in my hands." Witness was then between five and six months advanced in pregnancy by the defendant. The kick administered by the defendant caused the witness to miscarry. She was delivered of a dead child on the ninth day after the defendant kicked her. The child was perfectly developed except that the skull was mashed or crushed in, and was in three pieces. She was delivered of another dead child nine days after the first delivery. The body of the last child was decomposed and in fragments. Witness had imparted life to the children before she was assaulted. She visited defendant at the jail on the day after he assaulted her, and continuously as long as she could walk. Defendant said that he was sorry he kicked her, and witness was on good terms with him. She told no one about being kicked by defendant, until she was brought to bed, when she told her sister, who filed the complaint against the defendant. Witness was married to defendant about eleven months before this trial, and this was her first pregnancy by him.

Guadalupe Rodriguez, the sister of the first witness, was the next introduced by the State. She testified that, on or about June 15, 1887, she lived with her said sister, who, about nine days after the said date, gave premature birth to a female child. It was born dead, but was fully developed. Its head was in several pieces. Nine days later Manuela was delivered of the decomposed body of another child, so badly decayed that its sex could not be determined, the feet only being entire. Juliana Gonzales, the midwife, was present at the first of the said deliveries. On the day that the first child was born, the witness made a complaint against the defendant before Judge Hune. Witness, her husband, and a casual visitor named Florentino Comacho, were present when the first delivery occurred. The witness had no personal knowledge of the cause of the premature births.

Juliana Gonzales testified, for the State, that she was a mid-

wife, and acted as such to Manuela Rodriguez at the delivery of the first child. Witness removed the child from the womb and found that it was dead. Its head was in several pieces, but otherwise it was perfect for its period. It was about five months old. Witness could not tell how long it had been dead. She was not present at the alleged subsequent delivery, and knew nothing about it. The child of which the witness delivered Manuela was a male. The birth was a head presentation, and as it passed from the womb the pieces of skull fell into the witness's hands.

The State closed.

Ignacio Dominguez testified, for the defense, that he was the officer in charge of the Cameron county jail. Defendant was placed in that jail on a charge for misdemeanor some time before June 15, 1887. His wife, Manuela, visited him regularly up to some time in June. Witness was constantly about the jail, and never at any time heard of an assault upon Manuela by defendant. He distinctly remembers Manuela's last visit to the jail before her confinement. The defendant went to the jail kitchen and cooked some griddle cakes. Manuela left the jail about five o'clock on that evening. As she passed out she showed witness some of the cakes baked by defendant, and said: "See what it is to have a good husband. Being with child, I have had a longing for some cakes, and he has made them for me." Manuela always appeared to be on the best of terms with defendant.

L. Penaflor testified, for the defense, that he was jail cook during June, 1887, and often saw defendant and his wife together when the latter called. Defendant's treatment of his wife was always exemplary, and they appeared to agree admirably. Witness never heard of defendant assaulting his wife, or otherwise mistreating her, until this charge was brought against him.

No brief for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

HURT, JUDGE. In this case there was no motion to quash the indictment; but its sufficiency was questioned by a motion in arrest of judgment. Without noticing separately the several grounds upon which it was based, it suffices to say that the indictment is not obnoxious to any one of them.

The trial was had upon a charge of procuring an abortion, by

an unlawful assault upon the prosecuting witness, appellant's wife, the assault being alleged to have been made with the design of producing that effect. To prove the assault and the intent, the injured party, the wife of appellant, was introduced by the State. Under the statute, she was clearly a competent witness.

Testimony was given by the said witness to the effect that, in a fit of jealousy, appellant had kicked her on the abdomen, accompanying the act with words to be noticed hereafter. She further testifies that, about nine days thereafter, she gave birth to a still born child, its skull being crushed or mashed in, and in three pieces; that, after the lapse of another nine days, another was born, and that decomposition had so far set in that its sex was not distinguishable.

This witness was also permitted to testify, over objection, that the said abortion was the result of the kick described.

It is sometimes difficult to fix the point at which the competency of a non-expert witness, to assign a certain cause to a named result, ends. Assuredly, if one receive a blow which leaves an immediate marked impress that is appreciable by the senses of him who receives it, or that is in a like manner made sensible to bystanders, neither the injured party nor the onlooker need be an expert to qualify him to testify that the injury received was the result of the blow given. But, when a claimed result becomes so remote that conclusion and deduction are necessary to connect it with a cause, then the non-expert witness may only state physical facts and symptoms experienced, leaving the conclusion from them to the jury trying the cause. We are of opinion that the testimony was inadmissible, it coming within the last named class, and the witness not having been qualified as an expert.

For the error in admitting it, however, we would not feel authorized to reverse the judgment, had the witness gone on to state the facts upon which she based her opinion; for then the jury would have been enabled to compare and judge of the correctness of the conclusion. In her testimony there is an absence of such facts. True, she states that she "had felt life in the child before I (she) was assaulted by the defendant;" but she does not say at what length of time before, nor that she did or did not feel such sensation thereafter. No symptoms were testified to by her or others after the receipt of the kick, from which a conclusion as to its effect might be drawn. Then, again, the testi-

mony fails to show definitely, or with reasonable certainty, as to whether the skull of the first child delivered was reduced to three pieces by violence, or whether it had fallen apart at the sutures, by reason of the decomposition that had set in. These facts were susceptible of proof, and should have at least been made reasonably certain.

In response to a leading question put by the district attorney (she having evaded other methods of eliciting the testimony sought) the same witness answered that appellant said, as he was in the act of kicking her, "if that is my child, put it in my hands." To the bill of exceptions thereto, the trial judge appends an explanation to the effect that he had permitted this form of question because the witness was ignorant of the language and generally dull, and that she had shown herself to be an unwilling witness. Leading questions are permissible, even in a direct examination, "where the witness appears to be hostile to the party producing him, or in the interest of the other party, or unwilling to give evidence." (1 Greenleaf on Ev., sec. 435.) The testimony and appended explanation of the bill of exceptions show the existence of all these three elements which remove the bar to the leading questions. The witness did not institute this prosecution; in fact, she was evidently "hostile" to it; she forgave, as only woman can (as is evidenced by her visits and ministrations to her husband in the jail to which a prior offense had consigned him), even up to the day she was prostrated by premature confinement; that she was "unwilling" to testify is manifest from her evasions of the very questions propounded to elicit this evidence. Under these circumstances, the form of the question was clearly allowable, and the evidence was material, as bearing upon the intent.

For the error noticed, the judgment must be reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered November 26, 1887.