## S. A. NALLEY v. THE STATE.

### No. 2871.    Decided February 26.

| 28 | 387 |
| --- | --- |
| 28 | 417 |
| 28 | 387 |
| 30 | 457 |
| 30 | 650 |
| 31 | 298 |
| 31 | 585 |
| 31 | 603 |
| 31 | 636 |

1. **Practice—Jury Law.**—To being required to pass upon three special veniremen the defense objected that the same veniremen were presented at his former trial (which resulted in a mistrial), when he rejected them by peremptory challenge. His objection being overruled, the defendant again challenged the said special veniremen peremptorily, not, however, exhausting his peremptory challenges. *Held*, that the proposed jurors were not incompetent for the reason assigned; and moreover, the defendant not having exhausted his peremptory challenges, and having no objectionable juror forced upon him, could in no event be heard to complain.

2. **Same.** — **Charge of the Court** as to correctness and sufficiency will be examined by this court and tested as a whole, and not by disconnected paragraphs or excerpts.

3. **Same — Self-Defense — Reasonable Appearance of Danger.** — The court charged the jury as follows: "It is the right of the defendant to have the facts considered by the jury as they reasonably appeared to him at the time they transpired, and if, as the facts reasonably appeared to the defendant, he would be justified under the law as given in this charge, he should be acquitted. It would make no difference that the facts were mistaken by the defendant, and that he was in no real danger if it be so." *Held*, correct and sufficient.

4. **Same—Murder of the Second Degree.**—As a general rule it is unsafe in murder trials for the court to omit to charge upon murder of the second degree; and it is only when there is no evidence whatever presenting that issue that such a charge should be omitted. See the statement of the case for the substance of evidence *held* to have warranted a charge upon murder of the second degree.

5. **Practice—Evidence.**—The rule is now well established that when essential to the due administration of justice it is within the discretion of the trial judge to receive evidence at any stage of the trial before the conclusion of the argument, and the exercise of such discretion will not be revised on appeal unless it plainly appears to have been abused.

6. **Same.**—The district attorney asked his witness W. if a few days before this trial he did not have a conversation with the defendant's brother. The defendant's counsel objected to the question, but before he could formulate his objection the district attorney stated to the court, in the presence and hearing of the jury, that he proposed to prove by the witness that the brother of defendant induced him, the witness, to leave the county to avoid testifying in this case. It was not claimed by the State, nor did it attempt to show, that the defendant knew of or was connected in any manner with his said brother's attempt to suppress testimony; and the court erred in not charging the jury, under the circumstances, that without being directly connected therewith the defendant could not be held bound by any act or statement of his said brother. Primarily it was not competent to prove the act of the defendant's brother without connecting the defendant as a party thereto.

APPEAL from the District Court of McLennan. Tried below before Hon. J. R. Dickenson.

The conviction was in the second degree for the murder of Charley Gaines, and the penalty assessed by the verdict was a term of twenty years in the penitentiary.

It is only necessary under the rulings on this appeal to state the case fully enough to elaborate the ruling announced in the fourth head note.

Mrs. Burns was the proprietress of a small beer saloon situated in that part of the city of Waco designated as Sandtown, in which said saloon the deceased was employed as bartender. The deceased was killed in that saloon on the night of June 3, 1889. No third person was present at the time the fatal shot was fired, but independent of the defendant's admission, it was amply proved by the State that the defendant was the party who did the killing. The fatal shot entered at the back of the deceased's neck, a little below the ear, and passed out in the middle and at the upper edge of the forehead. The parties who entered the saloon immediately after the fatal shot was fired found an old broken-bladed knife lying on the floor near the body of the deceased. This knife, it was shown by the testimony, had been long used in that saloon to remove tin tags and revenue stamps from beer kegs.

For the State it was proved that the defendant and the deceased met at the house of a prostitute, a short distance from the Burns saloon, on the night preceding the night of the killing, and that they engaged in a violent altercation of words. Which of the parties precipitated that quarrel is not clearly shown by the State's proof, but inferentially it involves the defendant as the aggressor. During the next day, as shown by the evidence for the prosecution, the defendant made several unsuccessful efforts to borrow a pistol. It was also shown by the testimony of one witness that a few minutes before the homicide, and at the moment the defendant left the witness and walked towards the Burns saloon, he, defendant, referring to the deceased, said to the witness, "I am going to make the son-of-a-bitch take back-water or do him up." Another witness for the State testified that she passed the Burns saloon immediately before the killing, at which time she observed the defendant standing against a post on the sidewalk in front of the saloon, and looking into the saloon. Several witnesses testified that the defendant stepped out of the saloon immediately after the fatal shot was fired, with a pistol in his hand, and that he ordered them to "stand back." Several hours later in the night the defendant was arrested at the railroad depot.

A number of witnesses for the defense testified to repeated threats to kill defendant uttered by the deceased on the night and day preceding the killing, which threats, according to one witness at least, were communicated to the defendant. Several witnesses testified that immediately after the quarrel with deceased on the night preceding the fatal night, the defendant went to the residence of Mrs. Burns. This proof was corroborated by Mrs. Burns and Nellie Moore, an inmate of Mrs. Burns's house. According to Mrs. Burns and Nellie Moore, the former and the defendant went through the house to the rear steps, where they sat down and engaged in conversation. A few minutes later, and while Mrs. Burns and defendant were yet seated on the rear steps, the deceased came to, or passed the front of the house, and said, " He had a knife in his hand,

but I am fixed now.    If the God damned son-of-a-bitch comes out I will
blow the top of his head off."    An hour later, according to Mrs. Burns,
the deceased came to her gate and engaged her in conversation.    She
told him that both he and defendant were friends of hers, and that she
wanted them to drop the quarrel, and that defendant agreed with her
an hour before that he would do so if deceased would.    Deceased replied
that he would drop it when he had killed the son-of-a-bitch; which threat
the witness (Mrs. Burns) repeated to defendant during the course of the
night.

Mrs. Burns further testified that her house was situated immediately
across the street from that of Stella Ferguson.    It was in the house of
Stella Ferguson that the quarrel referred to by previous witnesses occur-
red on the night preceding the night of the killing.    While on her gal-
lery at about 8 o'clock on the said night she heard the deceased step upon
Stella Ferguson's gallery and exclaim, "I reckon I am the chief!"  Wit-
ness went into her room, but returned to the gallery a few moments later,
and as she stepped through the door she heard the defendant say, "If
you call me a liar again I will knock your teeth down your throat."  Soon
after that the deceased went off towards Clark's saloon, and witness went
to or near Stella Ferguson's gate and called defendant, who joined her and
accompanied her home.    What occurred at her house afterwards on that
night is outlined above.    About 11 o'clock on the next day defendant
came to witness's house and asked her for two dollars and a half on a debt
which she owed him.    Witness told him that she had not yet received any
returns from the saloon, but that defendant could go to the saloon and
get the money.    Defendant returned to witness's house on that evening
about an hour before the killing and asked for the two dollars and a half.
Witness again told him that he would have to go to the saloon and get it,
as no returns had yet been made to her.    For the moment she had forgot-
ten the hostility existing between defendant and deceased.  Deceased
tended bar in the witness's saloon.    Defendant did not keep, but some-
times slept with witness.

One of the witnesses for the defense testified that she heard the quarrel
between defendant and deceased on the night preceding the fatal night,
and that she saw the deceased, immediately after the quarrel, go from
Stella Ferguson's house to Clark's saloon, which he entered.    He soon
emerged with a pistol, and went towards Mrs. Burns's house.

Defendant testified on his own behalf that he went to Stella Fergu-
son's house on the night preceding the tragedy and took a seat on the
gallery.    He had been there but few minutes when the deceased arrived.
He walked up to witness, stood straddle of his legs, and using some vul-
gar language, exclaimed, "I am chief!"    Witness replied, "Well, if
you are, get from across my legs."    A quarrel ensued, in the course of
which witness told deceased that if he again called him a liar he would

slap his, deceased's, face.    About that time Stella Ferguson came out of the house and requested that no quarrel be engaged in on her premises. Witness acquiesced, and defendant soon left and went to Clark's saloon. Mrs. Burns then called witness and he repaired to her house, joined her on her front gallery, and went with her to the rear steps of the house, where they sat down and talked.    While there witness heard the deceased exclaim from the street in front of the house, "I am ready for the son-of-a-bitch now; let him show himself."    Witness remarked to Mrs. Burns that he wanted no trouble with deceased, and would leave by the back way.    Before going, witness told Mrs. Burns and Nellie Moore that he would drop the quarrel if deceased would.    Witness returned to Mrs. Burns's house later in the night, when Mrs. Burns told him that deceased told her that he would drop the quarrel when he had killed witness. Witness during the next day, in view of the deceased's threats, made several unsuccessful attempts to borrow a pistol.    He went to Mrs. Burns's house about eleven o'clock and asked her for two dollars and a half.    She replied that she had no money in the house, but that witness could go to the saloon and get it in her name.    About sundown witness returned to Mrs. Burns's house and again asked for two dollars and a half.    Mrs. Burns replied that she had not yet received any money, but that witness could go to the saloon and get it.    From Mrs. Burns's house witness went to the house of Allie Wages, Joe Williams, whom he met on the way, going with him.    While at Allie Wages's house witness observed a pistol lying in the tray of an open trunk.    He took it and put it in his pants under his vest.    Allie told him to put it back.    He told her that he wanted it but a short while, would take good care of it, and return it loaded if he should discharge it.    He then went to Harmon's saloon, and thence to the chile stand adjoining Mrs. Burns's saloon. Here he was joined by Joe Williams, who urged him to give up the pistol.    Witness declined, left Williams, and walked directly into the saloon. Deceased, who was alone in the room, was standing behind the bar.    He asked witness, "What the hell are you doing here, you son-of-a-bitch?" Witness replied, "I have come for some money I have orders to get." Deceased said, "I will pay you!  I will kill you, you son-of-a-bitch!" He thrust his right hand under the counter, seized what witness took to be a knife or pistol, and rushed towards the east end of the counter. Just as he was about to turn the end of the counter the witness fired, turned, and left the saloon.    As he stepped out he met Joe Williams and said to him, "He (deceased) ran at me with a knife and I shot him."

Several witnesses for the defense testified that, according to reputation, deceased was a man who would execute a threat.

*J. C. Jenkins* and *Pearre & Boykin,* for appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—There were two trials of this case in the lower court, the first having resulted in a mistrial. On the first trial three of the special veniremen, to-wit, Orand, Miller, and Fields, were peremptorily challenged by the defendant after they had been accepted by the State. On the second trial these same three parties were again summoned on the special venire, and were again accepted as jurymen by the State. Defendant objected to being required to pass upon them as jurymen, for the reason that they had been summoned on the former jury, and he had then peremptorily challenged them. His objection was overruled, and he again challenged them peremptorily, saving his bill of exceptions to the ruling of the court. He did not exhaust his peremptory challenges, and therefore his bill of exceptions, if well taken, would be entitled to no consideration, no objectionable or incompetent juror having been forced upon him. Willson's Crim. Stats., sec. 2293; Hudson v. The State, *ante,* p. 323.

But the jurors were not incompetent and subject to challenge for cause for the reasons stated. They did not sit upon the former trial. Had they served on the petit jury in a former trial of the case, then the challenge for cause would have been a good one under the eighth subdivision of article 636 of the Code of Procedure. As presented there is no merit in the bill of exceptions.

Several objections are most strenuously insisted upon, based upon bills of exceptions reserved to the charge of the court upon self-defense and reasonable appearances of danger. Some of the isolated excerpts commented upon, if standing alone and considered by themselves, might be obnoxious to the criticisms made upon them, but when considered as a whole we do not believe the charge is either illegal or objectionable. It fully embodies the law of justifiable homicide and self-defense as enunciated in our Penal Code; and as to reasonable appearances of danger the jury were expressly instructed that "it is the right of the defendant to have the facts considered by the jury as they reasonably appeared to him at the time they transpired, and if as the facts reasonably appeared to the defendant, he would be justified under the law as given in (this) charge, he should be acquitted. It would make no difference that the facts were mistaken by the defendant, and that he was in no real danger if it be so." Willson's Crim. Stats., sec. 1070.

As we understand it this is the law aptly and concisely expressed, and in such plain and intelligible manner as that no jury of ordinary intelligence could have failed to comprehend their duty under it.

Exception was taken to the charge because it submitted murder of the second degree. We are of the opinion the court properly submitted this issue, and had it failed to do so, the defendant might have been here strenuously urging the omission as fatal error. As was said by this court in Blocker's case, 27 Texas Court of Appeals, 16, "trial judges should be

exceedingly cautious in murder trials in declining to charge upon murder in the second degree. Instances are comparatively rare in which such a charge may be properly dispensed with. It is only when there is *no* evidence tending to present that issue that such a charge may be safely omitted."

Defendant objected to the State being permitted to have the witness Williams to testify to independent matters after the evidence for the State and defendant had closed. The objection was that no evidence, unless in rebuttal, could be heard after the defendant had closed his testimony. This objection is untenable. "When essential to the due administration of justice, it is within the discretion of the trial judge to receive evidence at any stage of the trial before the conclusion of argument, and the exercise of such discretion will not be revised on appeal unless it plainly appears to have been abused." Willson's Crim. Stats., sec. 2312; Code Crim. Proc., art. 661.

But with regard to this witness's (Williams's) testimony, and in connection with its introduction, it is made to appear by bill of exceptions that when first called to the stand the prosecution asked the witness if he, witness, had not had a conversation a few days before this trial with Sam Nalley, who was a brother of defendant, to which question defendant objected, when the district attorney immediately, and before defendant could interpose objection, stated to the court in the presence and hearing of the jury, "that he expected to show by the said witness Williams that the said Sam Nalley had induced him, said Williams, to leave the county so as not to testify."

The court signs this bill of exceptions without qualification or explanation, nor are the jury instructed by the court to disregard the statement of the district attorney. There was no statement by the district attorney to the effect, and no pretence that he sought to inculpate the defendant in any manner directly with this attempt to suppress the testimony. Even if the prosecuting officer could have proved what he stated, such testimony would have been clearly inadmissible against defendant unless he had been directly connected with the matter. Favors v. The State, 20 Texas Ct. App., 158; Marshall v. The State, 5 Texas Ct. App., 273. There being no proof that these overtures to the witness were made by the authority or with the knowledge of the accused, such statement by the district attorney was illegal and unjust, and was highly calculated to prejudice the accused. Barbee v. The State, 23 Texas Ct. App., 199. Anything Sam Nalley, the brother, might have done in the matter, in the absence and without the knowledge of defendant, was most clearly inadmissible against and could not be binding upon him (Maines v. The State, 25 Texas Ct. App., 568), and afforded no reasonable presumption or inference pertinent to the issue in the case for which defendant was on trial, and the court should have so instructed

the jury.   Taylor v. The State, 27 Texas Ct. App., 464.   "No improper means should be resorted to to prejudice the minds of the jury against the defendant in the remotest degree.   No testimony should be offered on the part of the prosecution that is not relevant and legal.   No remarks should be made by counsel for the State which are not fully warranted by the evidence."   Gazley v. The State, 17 Texas Ct. App., 267.   That the course of the district attorney in this matter was calculated to prejudice the rights of defendant is, we think, manifest.   How far he has been prejudiced, in the absence of any attempt upon the part of the court to obviate and avert the prejudice, it is impossible to tell.   The law demands a fair, impartial, and legal trial.   For this apparent wrong done the defendant in the trial below, the judgment is reversed and cause remanded.

*Reversed and remanded.*

Hurt, J., absent.