MINNIE LATHAM v. THE STATE.

No. 3293.   Decided November 11, 1914.

Rehearing granted December 16, 1914.

**1.—Murder—Manslaughter—Sufficiency of the Evidence.**

Where, upon trial of murder, and a conviction of manslaughter, the evidence was sufficient to sustain the conviction, there was no reversible error on that ground.

**2.—Same—Evidence—Hotel Register—Assumed Name—Withdrawal of Evidence.**

Upon trial of murder, there was no error in permitting the State to prove that defendant registered in a certain hotel register under an assumed name, shortly before the homicide, and to introduce in connection therewith said hotel register after identifying the defendant, and to permit the witness to testify that said name had been erased since by some one; besides, all of said testimony was withdrawn by the court from the jury by consent of both parties. Following Hatcher v. State, 43 Texas Crim. Rep., 237, and other cases.

**3.—Same—Rule Stated—Withdrawal of Testimony.**

The rule is well settled in this State that if the testimony is not of a material character and not likely to prejudice the jury, the error in admitting it is cured by withdrawing it. Following Miller v. State, 31 Texas Crim. Rep., 609, and other cases. Distinguishing Kemper v. State, 63 Texas Crim. Rep., 1, and other cases.

**4.—Same—Misconduct of Jury—Communication to Jury.**

Where, upon motion for new trial on account of the misconduct of the jury by receiving outside communication, the testimony showed that the alleged communication by an outsider to the jury could not possibly be construed to be such communications which would injure the defendant and vitiate the trial, there was no error in overruling the motion on that ground. Following Dowd v. State, 55 Texas Crim. Rep., 367.

**5.—Same—Misconduct of Jury—Separation of Jury.**

Where, upon motion for new trial on the ground of the separation of the jury, the testimony showed that the alleged juror could not have been separated

from his fellows for over one minute, and that the juror spoke to no one or anyone to him, except that the trial judge expressed astonishment in finding the juror alone, it was not such a separation of the jury as the law contemplated to vitiate the trial. Following Stewart v. State, 31 Texas Crim. Rep., 153, and other cases.

### 6.—Same—Evidence—Opinion of Witness—Bystander.

Where, upon trial of murder, the defendant had testified as to the acts and declarations of the deceased at the time the homicide occurred and that she acted in self-defense, there was no reversible error in permitting defendant's witness who was a bystander to the transaction to testify that from the acts of the deceased the impression on the mind of the witness was at the time this occurred that the deceased was attempting to draw his pistol, as this was not merely the opinion of the witness, but a statement of the facts. Prendergast, Presiding Judge, dissenting.

### 7.—Same—Evidence—Cross-examination—Bias of Witness.

Where, upon trial of murder, the defendant's witness gave material testimony in defendant's favor on her claim of self-defense, and the witness further testified that he had informed one of the attorneys for the defense as to his testimony, there was no error in permitting the State on cross-examination to show that the witness was biased against the State and in favor of the defendant and to bring out the facts that he had not informed anyone else of this testimony or reported the same to the officers. Davidson, Judge, dissenting.

### 8.—Same—Rule Stated—Bias of Witness—Cross-examination.

It is always permissible on cross-examination to show the bias, interest, animus and prejudice of any witness who testified, and the motives of a witness are never immaterial or collateral, and great latitude is allowed in asking questions to develop this on cross-examination. Following Blunt v. State, 9 Texas Crim. App., 234, and other cases.

### 9.—Same—Evidence—Moral Turpitude.

Either side has a right to ask and require a witness to answer if he has been prosecuted and convicted of a felony, and what occurred on this point upon the trial for murder was certainly permissible.

### 10.—Same—Charge of Court—Requested Charges—Explanation.

Where, upon trial of murder, defendant contended that she was seeking to induce the deceased to return to her certain letters which she had written to him, as an explanation of her act in seeking the deceased, which phase of the case the court submitted in a proper charge, there was no error in the court's refusal to submit a requested charge thereon.

### 11.—Same—Requested Charge.

Where a part of the requested charge was improper and the court, in his main charge, on the issue involved, was full and complete, there was no error in refusing a special charge.

### 12.—Same—Remarks of Counsel—Motion for Rehearing.

See opinion which holds that the caustic remarks of appellant's counsel in the motion for rehearing are wholly uncalled for.

### 13.—Same—Evidence—Fundamental Rule—Hotel Register.

The fundamental rule underlying all legal proceedings is that the best evidence of which the case is capable must be first produced, and there was no error upon trial of murder in permitting the State to introduce in evidence a certain hotel register which disclosed that defendant registered therein under an assumed name, and this, although the defense was willing to admit secondary evidence thereof; besides, all testimony with reference to admitting in evidence such register and the erasure of the name thereon was withdrawn from the

jury by the consent of the parties, and there was no error. Davidson, Judge, dissenting.

**14.—Same—Evidence—Cross-examination.**

Where, upon trial of murder, a witness for the defense had given material testimony for the defense, there was no error in permitting the State to attack the credibility of such testimony by showing that the witness voluntarily went to defendant's counsel and informed them of the fact, but did not also go to the State's counsel and tell them what his testimony would be; in order to show the interest and bias of the witness. Following Earles v. State, 64 Texas Crim. Rep., 537, 142 S. W. Rep., 1181, and other cases. Distinguishing Roberts v. State, 70 Texas Crim. Rep., 297. Davidson, Judge, dissenting.

**15.—Same—Evidence—Impression of Bystanders—Rule Stated.**

Impressions which are primary and for which no substituted proof is conceivable can be put in evidence; whereas, an impression which is merely a secondary idea of that of which a more accurate idea is obtainable can not be received, and where, upon trial of murder, a defendant's witness detailed the acts and conduct of the deceased at the time of the homicide, he should have been permitted to give the impressions made upon his mind at the time, which was that the deceased was reaching for a pistol. Following Thomas v. State, 40 Texas, 36, and other cases; such testimony was admissible to strengthen the testimony of the defendant on this phase of the case. Prendergast, Presiding Judge, dissenting.

Appeal from the District Court of Jones. Tried below before the Hon. Jno. B. Thomas.

Appeal from a conviction of manslaughter; penalty, five years imprisonment in the penitentiary.

The opinion states the case.

*Wright, Wynne & Harris,* and *Snodgrass, Dibrell & Snodgrass,* and *Cunningham & Oliver,* and *Will S. Payne,* and *Brooks & Brooks,* for appellant.—On question of admitting in evidence hotel register, etc., and afterwards withdrawing same from the jury: Clements v. State, 61 Texas Crim. Rep., 161, 134 S. W. Rep., 728.

On question of impression of bystanders: Thomas v. State, 40 Texas, 36; Harrison v. State, 25 S. W. Rep., 284; Cochran v. State, 28 Texas Crim. App., 422.

On question of cross-examination of witness: Hyden v. State, 20 S. W. Rep., 764; Roberts v. State, 70 Texas Crim. Rep., 297, 156 S. W. Rep., 653.

*C. E. Lane,* Assistant Attorney General, and *Jas. P. Stinson,* District Attorney, and *Higgins & Hamilton,* for the State.—On question of testimony as to hotel register: Wofford v. State, 60 Texas Crim. Rep., 624, 132 S. W. Rep., 929; Powell v. State, 50 Texas Crim. Rep., 592, 99 S. W. Rep., 1005, and cases cited in opinion.

On question of impression of bystander: Martin v. State, 58 S. W. Rep., 112; Funderburg v. State, 64 S. W. Rep., 1059; Smith v. State, 20 S. W. Rep., 360; Taylor v. State, 51 S. W. Rep., 1106, and cases cited in opinion.

On question that witness was charged with felony: Asbeck v. State, 70 Texas Crim. Rep., 225, 156 S. W. Rep., 925; Bogue v. State, 69 Texas Crim. Rep., 656, 155 S. W. Rep., 943; Ellis v. State, 69 Texas Crim. Rep., 468, 154 S. W. Rep., 1010, and cases cited in opinion.

On question of separation of juror: Boyett v. State, 26 Texas Crim. App., 689; Taylor v. State, 38 Texas Crim. Rep., 552; Champ v. State, 32 id., .87, and cases cited in opinion.

On question of sufficiency of evidence: Kearse v. State, 68 Texas Crim. Rep., 633, 151 S. W. Rep., 827; Barbee v. State, 23 Texas Crim. App., 199.

PRENDERGAST, Presiding Judge.—Upon an indictment and trial for murder appellant was convicted of manslaughter with the highest punishment assessed. This case has been before us heretofore on habeas corpus and is reported in 73 Texas Crim. Rep., 144, 164 S. W. Rep., 377.

Appellant was a married woman thirty-two years old. She had been married more than thirteen years and had a son about twelve years old. Deceased, John Stewart, was a young unmarried man about four years younger than appellant. She, with her husband and child, had lived at their home in Sterling City, Texas, for several years prior to 1913. She was engaged in the millinery and tailoring business and her husband was a clerk for a lumber company. Their places of business were a block or two apart. Deceased also lived in Sterling City from the latter part of 1911 to about April, 1913. She and deceased became acquainted in 1911. Soon thereafter he became a very frequent visitor to her at her place of business when her husband was not there. Deceased, it seems, became much attached to her and loved her, so he told her. She reciprocated his love. The evidence clearly justifies the conclusion, although denied by her, that this relationship ripened into illicit intercourse between them. He visited her at her home at nights when her husband was away and she alone. By mutual engagement about the 1st of April, 1913, deceased met her out at her barn one night while her husband was at home. Her husband detected them together at the barn and accused her of infidelity to him and sexual intimacy with deceased. At her solicitation, as well as for his own safety, deceased thereupon removed from Sterling City to Snyder, in Scurry County, where his widowed mother and other members of the family then resided, and thereafter continued to reside at Snyder. Her husband's discovery and accusations resulted in her leaving her home in Sterling City and going to her sister's in Teague, Freestone County, Texas, early in April. While at Teague she wrote deceased some letters which tended strongly to show her attachment for him and their previous illicit intercourse. She was away from her home and with her sister at Teague only about a week. While there her husband went on some business from Sterling City to Beaumont, Texas, and while away wired her to meet him at Temple and go back home with him, which she did. She protested all the time her innocence to her husband of any illicit relationship with the deceased, and they continued to live

together from that time to the time she killed the deceased, on January 20, 1914, she claiming that from time to time during this time her husband treated her well and at other times very badly because of his discovery and his charges of infidelity against her. While at Teague she received letters from the deceased. Upon leaving Teague she requested her sister to write deceased and procure the return to her sister from deceased the compromising letters she had written to him. For some reason deceased failed or refused to return the letters, but kept them. About two weeks after her return home with her husband, on April 26, 1913, she wrote deceased telling him that she did not care for him; that she hated him; that he had wrecked her home and caused her to lose the affection and confidence of her husband and denouncing deceased. On May 9th following, she wrote deceased another letter telling him she regretted writing him as she had in the one of April 26th, and requesting an interview with him soon, and requesting a reply to be addressed to her sister which she would procure.

The State introduced evidence tending strongly to show, though denied by her, that appellant and her husband went from Sterling City to Snyder in their automobile in July, 1913, heavily loaded with firearms, to kill the deceased at that time. The State also introduced much evidence showing the movements of appellant and her husband from about January 6, 1914, in their automobile again heavily loaded with firearms, which tended strongly to show that it was the intention of one or the other or both of them to then hunt down the deceased and kill him. Their movements were shown from about January 6, 1914, when they traveled from Fort Worth in their automobile to her husband's brother's in Dickens County, and thence from Dickens County down to Snyder, showing that on the evening of January 19 they reached a point near Snyder some time in the evening and waited there till after dark before going into Snyder; that while thus waiting she inquired for deceased from some citizen who passed her, indicating clearly that she was then seeking information if deceased was at Snyder; that after dark they went from their stopping place several miles from Snyder direct into Snyder in their automobile. She said that as she drove into Snyder she thought she saw deceased; they drove on around in the automobile until they got near the residence of deceased's mother when she got out, carrying with her her Savage automatic pistol, which carried nine steel cartridges, which she continuously thereafter carried concealed about her person; that at the time she got out of the automobile she had an understanding with her husband that she would meet him the next day at Roscoe, a station reached on one of the railroads from Snyder, and that her husband went there and waited for that purpose. Soon after she got out of the automobile she walked some block or two to the Maxwell Hotel in Snyder, kept by Mr. J. V. White, where she registered in the hotel register as "Mrs. C. C. Evert, Ft. Worth," and was assigned to room 22 by Mr. White. She is shown to have gone from that hotel that night, soon after she registered, out into the town and at a point where it is evident from all the testimony

she anticipated she would meet the deceased, but did not do so. It is unnecessary to detail all this evidence which tends so strongly to show that she was hunting for the deceased with the evident purpose of killing him upon sight, as she was not convicted of murder but of manslaughter. She is also shown, the next day, to have gone out in the town with a veil over her face and with a rain-proof coat on, which would prevent her from being recognized by one who knew her, still evidently on the hunt for deceased. She is also shown to have been out in front of the hotel a great deal of the time when she was not perambulating the streets, evidently watching for the deceased. The evidence is conflicting whether she had a veil over her face while she was out in the town and at the time and immediately before she killed the deceased. The preponderance of the evidence would show that she thus went all the time and did not raise the veil from her face until at the very moment when she shot and killed the deceased. The killing occurred early in the evening of January 20, 1914. The hotel where she stopped was two doors east from the northeast corner of the public square. The postoffice is on the west side of a street, going north from the northwest corner of the public square. The north side of the public square is occupied by business houses fronting south. In front of these houses was an ordinary concrete sidewalk about ten feet wide. Very shortly before she killed deceased it was shown that she was sitting on the sidewalk in front of the hotel; that deceased went to the postoffice and returned therefrom to the northwest corner of the square and crossed the street at the corner from the west side to the east side in front of the First National Bank building, which was on that corner. Where deceased stepped up on the sidewalk in front of said bank was plainly in view and in one block, and across one street, and two houses from where she was sitting. The evidence would clearly justify the conclusion that she saw and recognized deceased as he stepped up on the sidewalk in front of the bank. At this time she had the head of a little girl sitting by her side, in her lap. She hurriedly lifted the child from her lap, immediately got up and started somewhat briskly down the sidewalk to the point where deceased was and where she killed him. She went immediately and directly from the hotel, as described above, without stopping, to where she killed the deceased. Many persons were on the sidewalk and about it from the northeast corner of the court-house square to and beyond the bank building. The evidence is contradictory as to whether the deceased had just reached the sidewalk and stepped up on it in front of the First National Bank when she reached that point and killed him, or whether he had been there some short time and had sat down on the sidewalk with his back towards the bank building and his face somewhat south towards the public square. She contended and testified, and others also, that she met him at this point with his face towards her; that he had his open pocket-knife in his right hand; that he shifted it to his left hand, made a motion therewith towards her and threw his right hand down towards his right side where he then had his six-shooter. However, the pre-

ponderance of the evidence and the fatal shots which killed the deceased, clearly justified the jury to believe that the deceased was sitting on the sidewalk with his back towards the bank, his face fronting south, and that she shot and killed him without his knowing who it was, or without his making any demonstration whatever with the knife or any attempted demonstration with his right hand towards his pistol. The witnesses differed as to the number of shots she fired. All of them showed that not less than four were fired, others that one or two more were fired. There is no controversy, either by the witnesses, or from the wounds found on the body, that no shot hit him in the front part of his body anywhere. One shot struck him in the back of the flesh part of the left arm, entering the rear part of the body just below the armpit and passed entirely through his body, emerging near the front part of his right side near the armpit and passing through the front flesh part of the right arm. This ball, after passing entirely through both arms and the body, stopped in his shirt on the front and outside of his right arm. Another shot struck him near the lower part of the left shoulder blade about an inch and a half from the spinal column and passed entirely through the body, emerging in the front near the left nipple. Another shot penetrated about the same location to the right of the spinal column and passed through the body, lodging near the right nipple but did not emerge through the skin. Another shot penetrated his right buttock, ranging upward and inward and passing into the center of the body, remaining therein. When the first shot was fired, which evidently struck him one of said four wounds, deceased lunged forward, grasping the city marshal, Mr. Wolfe, by whom he was sitting on the sidewalk at the time. This threw him off of the sidewalk on the ground out in the street. He immediately called for someone to stop the woman from shooting, clinging to the legs of Mr. Wolfe and struggling to get up. Immediately after she fired the first shot into the deceased and when he fell off of the sidewalk into the street, she stepped off of the sidewalk, walked around and proceeded to immediately fire the other shots into his body. All the witnesses say that while she was doing this the back of the deceased was toward her. The marshal called to her to stop shooting and attempted to catch her pistol and prevent her shooting. In doing so one of the shots penetrated his right hand. She immediately stepped back and away so the marshal could not interfere and fired one or more of the shots into the body of the deceased. She claimed she knew nothing of what she did or what was done or said after she fired the first shot. The other witnesses show that about the time she ceased firing the marshal confronted her and demanded her pistol. Some say she delivered it to him; he and others say that she moved it behind her to prevent the marshal from getting it when he was reaching for it. The marshal says she said you had better call an officer. He replied that he was an officer, the city marshal, and then he reached around behind her with his wounded hand and took the pistol from her. That when she fired the last shot she smiled and several of the witnesses say that she was not excited,—very cool and calm.

As soon as the pistol was- taken from her by the marshal she discovered blood on her hand and garment from the hand of the marshal and requested to be taken into the drug store so that she could wash the blood off of her hand and garment, which was done.  She claimed she did not intend to kill the deceased but to see him and get her compromising letters from him and have him sign a statement that he had not had sexual intercourse with her so as to show her husband and pacify him.

This is a sufficient general statement of the case.  We have not undertaken to give the testimony of the various witnesses wherein it conflicted, except in the general statement above.

We take up the questions raised by appellant in the order in which she presents them in her brief.

She first claims that the evidence was insufficient to sustain the conviction in that it shows that she killed the deceased in self-defense.  Our study of the evidence has convinced us that the preponderance of the evidence on this question was clearly against her and we can not disturb the verdict on that ground.

The next question is shown by one of her bills wherein she objected to the State proving that the name she signed had been erased from the hotel register by some unknown person.  The bill on this point shows substantially this:  While Mr. White, the hotel proprietor, one of the State's witnesses, was on the stand, he testified that on the night of January 19, 1914, she came to his hotel alone and registered on his hotel register; that she signed the name "Mrs. C. C. Evert, Fort Worth," and he assigned her to room 22, he marking opposite her name the figures 22.  He had the register with him on the stand while he was testifying, which was then introduced in evidence.  After so testifying and identifying appellant as the woman who had so registered and signed, this occurred: "Is her name there now?  A.  It is not.  Q. What has become of it?  A.  Some fellow has erased it.  By Cunningham: We don't know if her name is there, if it is not there why it is not admissible unless they can connect her with it in some way.  I understand that we have some photographs and we have no objections to them, but we do object to them making any proof of anything that has been done on that, it has not been in her possession, unless they can connect her with it some way.  Q.  Mr. White, did counsel for the State cause you to have photographs of that record taken soon after that name was signed there?  A.  Yes, sir.  Q.  Examine that (hands him photo) and see if that is a correct photograph of the record as it was when she signed there.  (Witness takes and examines the photo.)  A. As to the condition it was in and the condition it is now.  A.  Yes, sir; all the other names are there but Mrs. C. C. Evert.  Q.  All the other names on the book are there but Mrs. C. C. Evert.  Is this a correct photograph as it was before her name was off of the record?  A.  Yes, sir.  Higgins: We offer the photograph.  Cunningham: No objections. Q.  The name Mrs. C. C. Evert, Fort Worth, 22, is that the place that she signed there?  A.  Yes, sir.  Q.  On the original record?  A.  Yes, sir.  (Photograph is now shown to the jury.)  Q.  Now, Mr. White,

how long did that record continue to look like she made it there before it was erased by someone? Cunningham: We object to it unless they can connect the defendant with the erasure, for she was in jail there for a good while. Higgins: We can not connect her with it. Court: You can state what was the original condition and what it is now. Snodgrass: We want to except to the introduction of any changed condition now on the ground that that character of testimony is calculated to prejudice the rights of the defendant. The court: It is already in. By Snodgrass: We ask the court to exclude it on the ground witness does not pretend, there is no pretense, that the defendant or anybody acting as agent for her had anything to do with changing it, and we further ask the court to instruct the jury specifically that they can not consider the statement that it is changed, or to its changed condition as any evidence against the defendant. (The bill specifically states as a fact, 'there was no testimony by any witness showing that the defendant or anyone authorized by her, had made said erasure.') The court: Objection is overruled. Snodgrass: We except to the action of the court. Q. Now, Mr. White, after she came did you assign her a room, after she had signed the register? A. Yes, sir. (Later in the trial the following occurred): By Higgins: We have come to the conclusion that the register itself, and erasure shown, the erasure made subsequent to the time of her signing it, might not be admissible, and we will ask the court to withdraw the register from the jury so it will not be in, unless they will withdraw their objection to it. Snodgrass: We do not object to the register, we just object to showing there was a change made in it. Higgins: We ask the court then to ask the jury not to consider that there had been a change in it. Court: If both of you want it I will exclude it. Do you (addressing counsel for defendant) join in this motion, they have made a motion to exclude testimony of the witness White. Snodgrass: With reference to the register having been changed we made a motion. The court: Do you renew your motion here? Snodgrass: Yes, we objected to it at the time. Court: Gentlemen, on motion of both parties, the statement of the witness White that the register had been changed, and all testimony along that line about the register there showing on the register C. C. Evert, the statement that the register had been changed, is excluded from your consideration, and you will not consider it for any purpose whatever. The court approved this statement from the stenographer's notes to the bill. It shows the correct way the matter came up and was disposed of, the register with the erasure was admitted without objection."

Now what are the facts as shown by this bill? They are: Mr. White, the hotel proprietor, swore that appellant came to his hotel alone at night on January 19, 1914, and registered in the name of "Mrs. C. C. Evert, Fort Worth." He had the hotel register with him, which was identified by him as such at the time. The best evidence of the fact was the hotel register with her signature thereon. This was the very first testimony on that subject. If the register had not then

been introduced the jury would not have understood it and perhaps would have doubted White's testimony of the fact. Of course, the appellant herself had not at that time testified and the State could not know that she would do so. Hence, the State asked Mr. White if her name was then on the register and he answered that it was not. And when asked what had become of it, he said: "Some fellow has erased it." No intimation by this that she had done so, and as immediately expressed by her attorney, Mr. Cunningham: "We don't know if her name is there, if it is not there, why it is not admissible unless they can connect her with it in some way." Then stating that they had had photographs taken of it when it was there, and further showing that the register had not been in her possession and that she had been in jail for some time. The State's attorney at once stated specifically that they could not connect her with the erasure, and the bill states clearly as a fact, that there was no testimony by any witness that she or anyone authorized by her, had made said erasure. In our opinion the register was clearly admissible under the circumstances of this case and at the state of the trial when it was admitted. The ground of objection was that the register in its changed condition with her name erased "is calculated to prejudice the rights of the defendant." The whole matter shows that the State specifically admitted that they could not connect her with the erasure and did not attempt to do so. But suppose that the register was inadmissible. Under the circumstances and the proof made, it could in no possible way have injuriously affected the appellant; that she so registered at the hotel under that assumed name is in no possible way disputed. She swore it herself. Her identity, or that she was the person who killed the deceased, is in no possible way disputed.

Again, suppose the register with her name erased was not admissible. It unquestionably was thereafter withdrawn from the jury by the express consent of the appellant with the consent of the State and any possible harm that it could have caused appellant was cured by its withdrawal.

The rule is, as contended for by appellant, that where *illegal testimony of a material character which is calculated to influence or affect the jury adversely to the appellant,* is admitted over his objections at the time, the withdrawal of it later will not cure the error. The appellant cites authorities to that effect and also Mr. Branch lays this proposition down and cites many authorities from this court to sustain it in section 322 of his Criminal Law.

But it is as equally well settled and the rule, that *if the testimony is not of a very material character and not likely to prejudice the jury,* the error in admitting it is cured by withdrawing it. This correct rule and the application of it, is clearly and well established by the many decisions of this court. We cite only some of them. Miller v. State, 31 Texas Crim. Rep., 609, 21 S. W. Rep., 925; Hatcher v. State, 43 Texas Crim. Rep., 237, 65 S. W. Rep., 97; Robinson v. State, 63 S. W. Rep., 869; Trotter v. State, 37 Texas Crim. Rep., 468, 36 S. W. Rep.,

278; Jones v. State, 33 Texas Crim. Rep., 8, 23 S. W. Rep., 793; Morgan v. State, 31 Texas Crim. Rep., 1, 18 S. W. Rep., 647; Sutton v. State, 2 Texas Crim. App., 342; Roberts v. State, 48 Texas Crim. Rep., 210, 87 S. W. Rep., 147; Martoni v. State, 74 Texas Crim. Rep., 90, 167 S. W. Rep., 351; sec. 1120, White's C. C. P.

In Hatcher v. State, supra, this court said: "Some of the cases hold that the exclusion of such testimony (inadmissible) will not cure the error, while others hold the contrary. In such a conflict the true rule would seem to be that, *if the admitted testimony is of such a damaging character as to suggest the impossibility of withdrawing the impression produced on the minds of the jury,* and thus curing the error, it will be cause for reversal; otherwise, *if the testimony is not of that damaging character, and not likely to influence the jury, it can be withdrawn, and the error of its admission thereby cured.*"

In Miller v. State, supra, which was a murder case, with the death penalty inflicted, and affirmed, this court said:

"The affidavit charging defendant with the offense of slander was also admitted in evidence. The slander charged imputed to the female mentioned a want of chastity of a most revolting nature. The contents were hardly germane to any issue in the case, in the absence of evidence bringing home knowledge to defendant of the existence of the affidavit, and we are not prepared to say that it may not have prejudiced defendant in the minds of the jury. The court, however, subsequently withdrew the affidavit from the consideration of the jury and instructed them verbally, as well as in writing, to disregard it as evidence in the case.

"The effect of withdrawing and excluding testimony erroneously admitted, which was or may have been prejudicial in its nature and tendency, has been the subject of much discussion in the courts, and the decisions are not harmonious upon the question. The weight of authority, however, seems to be that such withdrawal cures the error, and such has been the opinion entertained by this court. Sutton v. State, 2 Texas Crim. App., 342; Marshall v. State, 5 Texas Crim. App., 273; Phillips v. State, 22 Texas Crim. App., 139 (2 S. W. Rep., 691); Nalley v. State, 28 Texas Crim. App., 297 (13 S. W. Rep., 670); see also State v. Towler, 13 R. I., 661; Thomp. Trials, secs. 715, 722, 723, and notes.

"In Sutton's case, supra, it was said: 'But, conceding the court erred in admitting this testimony, the error, if in fact any was committed, was corrected by the court afterwards withdrawing it from the consideration of the jury.' This ruling has been approved in subsequent cases, and the doctrine uniformly upheld, that when improper evidence has been admitted over objection, it is the proper practice, and may become the duty of the court, to exclude or withdraw it from the jury and instruct them to disregard it in finding their verdict. Authorities above cited; Willson's Crim. Stats., sec. 2514.

"To hold otherwise would be to sanction the doctrine that the court could not cure any error into which it may have fallen by mistake or inadvertence, and thus render it helpless to rectify errors committed,

and the trial a mockery and a farce. We can not sanction such a doctrine. It is not intended here to hold that cases may not arise in which the withdrawal of testimony would not cure the error committed in admitting same, for it may occur that such evidence was of such a prejudicial character as to so influence the jury against the defendant that he would be deprived of a fair and impartial trial. We do not think, however, this evidence of that character."

So that in no event did the court commit reversible error in this matter.

The cases cited and relied upon by appellant show that the testimony therein was not only inadmissible and admitted over the objections of appellant at the time, but that it was of a materially injurious character and that such evidence was kept before the jury some days, commented upon by the attorneys in their argument and not withdrawn until all this had occurred. Take for instance Kemper v. State, 63 Texas Crim. Rep., 1, cited by appellant. Most damaging illegal testimony was admitted over appellant's objection. This evidence remained before the jury for several days, and was specially argued by several of the attorneys in the argument of the merits of the case, and then, and not till then, withdrawn from the jury by the court, the attorney for the State then stating, the effect of "that which is once in can not be withdrawn."

Appellant next complains that a new trial should have been granted to her because of what Mr. J. B. Murray, brother-in-law of one of the jurors, said to the jury. The State contested this ground of appellant's motion and the court heard evidence thereon. To the motion is attached the affidavit of T. W. Holden to the effect that on Saturday, August 8th, he was sitting on the south steps of the courthouse about 1:30 or 2 o'clock talking to a man, and J. B. Murray, who was at a watermelon wagon (out in the public square), called to the jury who were in the third story of the courthouse and asked if they wanted some melons. Some member of the jury replied, "We have two, and they are fine, that's enough for a while." That Murray then came by the steps where affiant was sitting, looked up and said: "Get busy, you ain't doing anything." Some member of the jury answered: "We don't have to." On hearing of the motion said Murray testified that he was a merchant in the clothing business and that someone, he couldn't tell who, in the third story of the courthouse called for a watermelon out of one of the windows; that he turned to get it and someone said that they had two up there and didn't need any. He supposed that whoever it was in the third story was in the jury room in the third story of the courthouse; that if he made any remark to the jury in any manner, shape or form about the case he didn't recall it.

The court committed no error in refusing a new trial on this ground. The testimony on the subject could in no possible way be construed to be such a communication to the jury by an outside party as would vitiate the trial. It did not injure appellant and it could not.

The only authorities cited by appellant on this subject are Nance v.

State, 21 Texas Crim. App., 457, and March v. State, 44 Texas, 64. Both of these cases are against appellant's contention. In the Nance case the court said:

"That two of the jurors conversed with a person not a juror about the case, pending the deliberation of the jury upon the case, does not necessarily entitle the defendant to a new trial even in a felony case. It must be made further to appear that by reason of such improper conduct, injustice was probably done the accused. In March v. State, 44 Texas, 64, it is said that the conversation of a juror with a person not a juror, must be such as was calculated to impress the case under consideration upon the mind of the juror in a different aspect from the one made upon the mind from hearing the evidence, or of such a nature as was calculated to result in harm to the party on trial, or the conversation will not be a ground for a new trial." See also Dowd v. State, 55 Texas Crim. Rep., 367.

Appellant next contends that a new trial should have been granted because one of the other jurors separated from the panel. The State also contested this ground of the motion. The court heard evidence thereon. To the motion appellant attached the affidavit of several persons. The evidence on this question is to this effect: That while the case was on trial the court one day took a recess of some ten minutes. The jury in charge of the sheriff and one of the deputies were conducted out of the courtroom to an adjoining hall on the same floor to the water cooler and toilet; that before taking them out all other persons were removed from about the cooler in the hall and the toilet. The jury remained out there some few minutes, some of them getting water, others going into the toilet to attend to nature's calls. Some three or four of the jurors were in the toilet at the same time, the others in the hall about the water cooler, right at the toilet. It seems as each got through in the toilet they went back into the hall adjoining, only a few feet away, to where the other jurors and officers were. One of the jurors was detained in the toilet attending to a call of nature after the others had gotten out of it. No one whomsoever was in there with him at any time while the others were in the hall. Without any of them noticing that this juror in the toilet was still therein, they announced that they were ready to return to the courtroom. The officer thereupon returned to the jury box with them, some thirty-seven feet from the hall. Just as the jury were in the act of taking their seats in the jury box, some of them having done so, others not, the officer discovered that there were only eleven men. He immediately announced the fact to the jury and required that they return with him to the hall, which they all at once proceeded to do. As they got near the hall door in the courtroom the other juror, in company with the district judge, entered the courtroom from the hall door thereof. The jury then returned to the jury box and took their seats. The juror testified that no one was in the toilet with him nor in the hall when coming out of it, only he saw the district judge and asked him where his crowd was. The judge expressed astonishment that this juror was there alone, and at once,

with the juror, entered the courtroom when he joined the others as stated; that no one spoke to him and he spoke to no one. The time elapsing from when the eleven jurors left the hall at the water cooler and toilet to the time they returned to the jury box after the other juror joined them was a very brief space of time, the officer in charge of the jury swearing that it was something like only a half minute,—couldn't have exceeded one minute. The evidence as a whole clearly justified the judge to find and believe, as he did, that the juror spoke to no one and no one spoke to him, except what occurred between the judge and himself, as stated above, and that no one other than the judge was in a position to have spoken to the juror or anyone to him. The affidavits of several persons attached to appellant's motion would indicate that there were persons about the hall and just inside of the courtroom at the door who were in such proximity to the juror as to have spoken to him or they to him. None of them indicate, however, that the juror said anything to any person or any person said anything to him other than the judge.

In our opinion this clearly was no such separation of the jury as the law could have contemplated would vitiate the trial.

The statute, article 745, Code of Criminal Procedure, is: "After the jury has been sworn and impanelled to try any case of felony, they shall not be *permitted* to separate until they have returned a verdict, unless by permission of the court, with the consent of the attorney representing the State and the defendant, and in charge of an officer."

Article 837, Code of Criminal Procedure, is: "New trials, in cases of felony, shall be granted for the following causes, *and for no other.*"

This statute gives nine separate grounds which would authorize a new trial. Not one of them says that the separation of the jury shall be such ground. The only one of them which could at all be construed to embrace the separation of the jury is the eighth, which is: "Where, from the misconduct of the jury, the court is of opinion that the defendant has not received a fair and impartial trial; and it shall be competent to prove such misconduct by the voluntary affidavit of a juror; and a verdict may, in like manner, in such cases be sustained by such affidavit." The statute says that for such misconduct to authorize a new trial it must be when *"the court is of opinion that the defendant has not received a fair and impartial trial."* Not that separation alone would authorize or require a new trial, but only when the court is of the opinion that because thereof the defendant has not received a fair and impartial trial. The decisions of this State are not uniform on this subject. These articles of our Code, 745 and 837, have been therein continuously, at least since 1856, when the Codes were first adopted. The Supreme Court of this State, when it had criminal jurisdiction, in construing them held that before the court was authorized to grant a new trial because of the separation of the jury, the appellant had to show that because thereof he had not had a fair and impartial trial. In other words, unless he showed injury he was not entitled to a new trial. On this subject, in Jack v. State, 26 Texas, 1, the Supreme Court said:

"There may have been misconduct on the part of some of the jurors; but, when a new trial is sought on the ground of misconduct of the jury, it must be shown to have been such misconduct as has affected the fairness and impartiality of the trial."

In Wakefield v. State, 41 Texas, 556, the Supreme Court said: "It is not pretended that the juror conversed with any person in regard to the case, or that the defendant has not received a fair and impartial trial because of any misconduct of the jury. The juror may have been guilty of misconduct but it is not shown that it has had any influence on the fairness of the trial, and that the discretion of the court was not properly exercised in overruling that ground of the motion. Jack v. State, 26 Texas, 1, and Jenkins v. State, 41 Texas, 128."

In Ogle v. State, 16 Texas Crim. App., 361, this court, through Judge Willson, said: "The mere separation of a jury (pending verdict) is not cause for a new trial. In addition to the separation in contravention of the law, . . . it must be further made to appear that by reason of such separation probable injustice to the accused has been occasioned." He cited the statute and Davis v. State, 3 Texas Crim. App., 91; Cox v. State, 7 Texas Crim. App., 1; West v. State, 7 Texas Crim. App., 150; Russell v. State, 11 Texas Crim. App., 288.

In Stewart v. State, 31 Texas Crim. Rep., 153, where it was shown that two jurors, unaccompanied by any officer, had separated from the others, unaccompanied by any officer, took some bedclothes upstairs, went into a friend's room, got a drink of whisky, and upon being asked by him they told him the jury had not agreed upon a verdict, the court said: "This, however improper and suspicious, would not of itself warrant a reversal; it not being shown that probable injustice was done."

In Boyett v. State, 26 Texas Crim. App., 689, where the jury separated and appellant sought a new trial on that account, which was a murder case with a life sentence and affirmed, Judge Hart said: "In cases like the one in hand, and where the jury separated without permission of the court, to reverse, it must appear that the juror conversed with others about the case, or was guilty of misconduct to the prejudice of the accused." He cited Jones v. State, 13 Texas, 168, and the Jack and Wakefield cases, supra, and March v. State, 44 Texas, 64; DeFriend v. State, 22 Texas Crim. App., 570.

Judge White, in section 865, page 559, of his Annotated Code Criminal Procedure, says: "To reverse because the jury separated without the consent of the court, it must appear that the separating juror conversed with other persons about the case, or committed other misconduct to the prejudice of the accused." He treats this subject on two grounds: First, "separation by consent," and second, "separation without consent." The statute and decisions also make this distinction. This case comes within the second class.

We have many cases more recently decided, and even almost down to this very date, citing and approving the rule above announced and the decisions cited in this second class. However, other decisions may be found indicating, and perhaps holding, that when a separation of the

jury has occurred by permission of the judge, contrary to the statute, the court will not look into the question at all to see whether any injury has occurred or might have occurred.  These decisions are more especially under said first class.  Clearly the trend of the later decisions under both classes go no further than holding that when a separation has occurred, the burden is on the State to show that no injury occurred. This may perhaps be regarded now as the rule.  Certainly it is as liberal to an accused as the statute authorizes or the courts should require.

In Dowd v. State, 55 Texas Crim. Rep., 367, in considering the misconduct of the jury in one separating from the other jurors and talking about the very case on trial, this court said: "In appellant's motion for a new trial he complains of the misconduct of the jury in that, after the jury retired to consider their verdict, one of them talked with the county judge of the county.  In the course of said conversation, the county judge remarked to the said juror, Lyon, that the defendant (meaning this defendant) was guilty of murder.  That said judge did not know until said juror was leaving his office that he was a juror in the case.  That the juror was absent from the others, and defendant says that such separation was not had by his knowledge or consent, nor by the knowledge or consent of his counsel.  This motion is sworn to by the defendant, but we find no evidence in the record to support the affidavit; but the judgment of the court recites that the court heard the evidence on the motion, and that same should be overruled.  This is the only matter complained of in the motion for a new trial."  And the court affirmed the case.

In Robinson v. State, 58 Texas Crim. Rep., 550, in which the court affirmed a death penalty, this court, through Judge McCord, said: "The mere separation of a jury pending verdict is not cause for a new trial; in addition to the separation, in contravention of law, it must be further made to appear by reason of such separation probable injustice to the accused has been occasioned"—citing and reviewing many of the cases cited supra and others.

In Barnes v. State, 61 Texas Crim. Rep., 37, the court, through Judge Davidson, said: "One of the grounds of the motion for new trial is that the jury separated after being empanelled.  The facts show that the horse of one of the jurors had gotten out of the pasture where he had placed it for safe keeping during the trial, and was passing along the street dragging a rope; that the juror left the jury and caught the horse a distance of twenty-five or thirty steps away, and that an attorney in the case walked up and took the horse to take care of, or at least to relieve the juror of the trouble of the matter.  There was nothing said by the juror to the attorney or the attorney to the juror, or by anybody to the juror in regard to the case.  The above is the substance of the matter in regarded to the separation.  We are of opinion that this is not of sufficient importance to require a reversal."

In Galan v. State, 68 Texas Crim. Rep., 567, 150 S. W. Rep., 1171, the court, through Judge Davidson, in discussing appellant's bill complaining that the court permitted part of the jurors to separate and

intermingle with other people in the courtroom without being accompanied by proper officers, and in violation of the statute, said: "It does not undertake to show that the jurors had anything to do with the people, or talked with them, or that anybody spoke to them." See, also, to the same effect, Kinney v. State, 67 Texas Crim. Rep., 175, 148 S. W. Rep., 783; Phillips v. State, 59 Texas Crim. Rep., 534; Cabrera v. State, 56 Texas Crim. Rep., 141; Jones v. State, 69 Texas Crim. Rep., 447, 153 S. W. Rep., 897; Parshall v. State, 62 Texas Crim. Rep., 177. A large number of other cases to the same effect could be cited, but we deem it unnecessary to do so.

We have considered all the cases cited by appellant to maintain his proposition. The facts in these cases are nothing like the facts in this. In them a clear separation of the jury was shown and for such length of time and so great distance as to make them wholly unlike this case.

Sterling Bynum, among other things, testified, in substance, that he was in the street some eighty feet, at least, distant from the deceased at the time appellant first shot the deceased; that he, the witness, was facing east; that deceased's back was to him, deceased also fronting east; that appellant was fronting toward him, saying: "The first thing that I saw, I saw this woman raise her veil with her left hand and then at that time she was pulling the gun out and he throwed his hand up, his left hand up that way (indicating). He had his hands in front of him like this, and he was either at the time whittling or cleaning his finger nails. He throwed this left hand up and dropped his right hand down and when this hand got up about there, it looked like, then the gun fired. Yes, sir, he threw his right hand down. He throwed his right hand down to about his belt, that is where he had his right hand at when he started falling. As to which I saw first, the man's hand dropping to his side or the lady drawing the gun, will say that they both happened at the same time." The bill then shows: "Whereupon, the witness was then asked: Q. What did you think he (John Stewart) was doing with his right hand?" The State objected to this and the court sustained the objection and would not let the witness answer the question. If permitted, the witness would have answered that the impression on his mind at the time was "that the deceased was attempting to draw his pistol." The court, in approving the bill, did so with the statement and qualification that "according to the testimony of this witness at the time of the occurrence referred to he was behind Stewart going in the same direction, about eighty feet from him, Stewart's back to him. The court did not think this character of testimony admissible in the first place, but if it was, then the court did not think the witness in a position to give any impression." The court's action and ruling was correct. What the witness *thought* or that he thought deceased was attempting to draw his pistol, is a matter of opinion and conclusion. The jury were to draw their conclusion and not the witness his. Besides, as is stated by the judge, he was in no position to see or tell that deceased was attempting to draw a pistol. The appellant herself was permitted to testify to all of what she claimed was deceased's acts in

.this particular at the time and what she thought and believed he intended to do thereby. She was the actor and person to be affected thereby and not this witness. The cases cited by appellant on this point, in our opinion, are not applicable.

Appellant's next contention is presented in what she calls her bills of exceptions Nos. 5, 6, 7 and 8. This appears to be a kind of running bill of exceptions. They show this: That Joe Lockwood gave material testimony in appellant's favor on her claimed self-defense to the effect that he was looking at appellant and deceased just before the first shot was fired and saw the deceased extend his left arm in the direction of appellant and throw his right hand to his right hip and about that time he heard the first shot fired.

Appellant killed deceased January 20, 1914. She was immediately arrested. The grand jury of Scurry County indicted her on March 16, 1914. On March 28th the court changed the venue to Jones County. After her arrest an examining trial was held. Lockwood did not testify in that trial. He was not even subpoenaed as a witness in the case until after the trial at which this conviction occurred had been going on for some days. In fact, just a short time before he testified, and he was the very last witness appellant first introduced in rebuttal. The State, in its cross-examination of this witness, evidently was contending that his evidence was a recent fabrication and was undertaking to show that he was biased against the State and in favor of appellant. He first, on cross-examination, when asked whom he had first told about what he testified he had seen, said: "I never told anybody until they found it out. I do not know how they found it out." He further testified that he first told Mr. Payne, one of the attorneys for the appellant, and that he first told him about a month before the trial; that it might have been longer; that Payne didn't go to him and ask him about it, but he went to Payne and told Payne about it; that he went up into his office and told him. Then he said that he told Mr. Payne about six months before what he knew about the case, or maybe longer than that. Then the bill shows that this occurred: He was asked and answered that said Payne, appellant's attorney, had a railroad suit for him, but denied that he had any other case for him. Mr. Snodgrass, one of appellant's attorneys, then said: "We object to that and ask that the jury be instructed not to consider the question and answer." The court instructed the jury: "You will not consider that question and answer." Mr. Wright, another of appellant's attorneys, then said: "We want a bill also to the question being asked."

The cross-examination then continued for some time, then this occurred: The State's attorney asked him, "Have you been charged with a felony in Scurry County?" Mr. Cunningham, another attorney for appellant, said: "Let counsel limit the time; it is a proper question if limited properly, but we object to it unless it is limited properly." The court said: "Limit the time." The State's attorney asked: "Well, within the last four or five or six years, you would say you wasn't?" A. "No, sir; I haven't." Mr. Snodgrass: "We object to the state-

ment of counsel and except to it." The court: "What statement?" Snodgrass: "The statement that you haven't been in the last four or five years." The State's attorney: "I asked that if within the last four or five years he wouldn't say that he hadn't and he said no." This is all that occurred on this point at that time.

Then the following occurred: The State's attorney asked him: "Mr. Payne has represented you all the time up there, hasn't he? A. Yes, sir. Q. You stated that Mr. Payne had represented you all the time up there as counsel, hasn't he? A. Yes, sir. Q. W. S. Payne? A. Yes, sir." Mr. Wright for defendant said: "We object to that; that is not impeaching testimony." The court: "Well, no." Mr. Wright: "Also if the witness had a case that he (Payne) was counsel in that does not tend to impeach him." Mr. Higgins, for the State: "It just shows the interest that the witness would have in his lawyer." The court: "I think I will overrule the objection; you can have your bill." Mr. Wright: "We except." This is all on this subject.

Then this occurred: By the State: "Joe, why didn't you tell others who were trying in this case, in this matter, to find out the truth about it, about your evidence? The sheriff or the county or district attorney, who had held a term of court there, or the county attorney?" Mr. Cunningham, for appellant, said: "We object to that as irrelevant and immaterial." The court: "Objection overruled." Mr. Cunningham: "The witness does not have to report his evidence to anybody; especially is he under no obligations to report it to the district attorney or to private prosecution, and we except to it as being immaterial and irrelevant." The court: "Objection is overruled." Mr. Cunningham: "We except." "Q. Why didn't you do so, why didn't you report it to the citizenship of Scurry County, to the officers charged with administering the law? A. I didn't think I had any right to do it." This ends these bills.

None of this was error by the court.

It is elementary by all the text-books and decisions that it is always permissible, on cross-examination, to show the bias, interest, animus and prejudice of any witness who testifies. The motives, animus, interest and bias of a witness is never immaterial or collateral. Great latitude is always allowed in asking questions to develop this on cross-examination. In Blunt v. State, 9 Texas Crim. App., 234, Judge White, for this court, citing text-books and cases, says: "Great latitude is allowed in the questions which a party is permitted and allowed to ask on cross-examination; and he will seldom be stopped by the court, unless the question be manifestly irrelevant to the case, and calculated neither to qualify the examination in chief nor to impeach the credit of the witness. . . . Generally, on cross-examination, a witness may be asked any question the answer to which may have a tendency to affect his credit." Again, in Daffan v. State, 11 Texas Crim. App., 76, this court said: "Generally, on cross-examination, a witness may be asked any question which may have a tendency to affect his

Vol. 75 Crim.-38

credit and it is the right of the defendant to show the animus and bias of a witness towards him and its extent." The State equally has the same right. It is needless to cite the many authorities, both in this State and the text-books on this point. We cite only some of them. Watts v. State, 18 Texas Crim. App., 381; Gelber v. State, 56 Texas Crim. Rep., 460; Sexton v. State, 48 Texas Crim. Rep., 497; Green v. State, 54 Texas Crim. Rep., 3; Crist v. State, 21 Texas Crim. App., 361; Rosborough v. State, 21 Texas Crim. App., 672; Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 611; Earles v. State, 64 Texas Crim. Rep., 537; R. R. Co. v. Matthews, 100 Texas, 63; 40 Cyc., 2666; Underhill on Crim. Ev., sec. 222; 5 Jones on Ev., secs. 822, 828; 1 Whart., Crim. Ev., sec. 477; 3 Chamberlayne on Ev., sec. 1785; 2 Ency. of Ev., p. 407; 2 Wigmore on Ev., sec. 948.

It is the uniform practice and always permissible in the organization of a jury to test the jurors' bias, prejudice, interest, etc., by asking whether or not the attorney of the adverse side is the attorney for the juror. This is always done not for the purpose of disqualifying the juror as cause for challenge within itself, but to ascertain what influences such juror may be affected by in order to determine whether the juror will be peremptorily challenged. (2 Ency. of Ev., p. 401; 1 Thompson on Trials, sec. 101, p. 114; 24 Cyc., 277.) We deem it unnecessary to further discuss or cite authorities on this point.

It is always the case that either side has a right to ask and require a witness to answer if he has been prosecuted and convicted of a felony. What occurred on this point, as shown, was certainly permissible under all the authorities.

Also the uniform practice is to ask an adverse witness on cross-examination, whom he first told of his testimony and the circumstances under which he so told them. All that occurred, as shown by this bill, was clearly within the State's rights in cross-examination. R. R. Co. v. Matthews, 100 Texas, 63, and the other authorities cited above.

The court did not err in refusing appellant's requested charge No. 2. The court's charge fully covered this subject. It was:

"You are charged that the defendant had the right to seek the deceased for the purpose of requesting of him the return to her of any letters, if any, she had written to the deceased, and to request of him a written statement to show her husband the previous relations that had existed between the deceased and defendant, and also the right to arm herself against any attacks the deceased might make upon her, or that she reasonably feared he would make upon her while so doing, if any."

Neither did the court err in refusing to give appellant's fourth special charge. The charge of the court on that subject was full and complete. The latter part of that requested by appellant clearly ought not to have been given.

These are all the questions presented by appellant in the able and forcible brief of her attorneys. There are some other questions raised

which we have considered but none of them present any error. Appellant does not brief them. The judgment will, therefore, be affirmed.

*Affirmed.*

DAVIDSON, JUDGE (dissenting).—I dissent. There was error in regard to admitting in evidence of the erasure of the name on the hotel register, and in the bills in regard to the witnesses Bynum and Lockwood.

ON REHEARING.

December 16, 1914.

HARPER, JUDGE.—On a former day of this term this case was affirmed, Judge Davidson at that time dissenting, he stating in the memorandum attached to the opinion that "there was error in regard to admitting evidence of the erasure of the name on the hotel register, and in the bills in regard to the witnesses Bynum and Lockwood." At the request of my associates I have taken the record and read and studied it carefully and thoughtfully, the able and exhaustive briefs filed by counsel for appellant and for the State, as well as the motion for rehearing filed herein.

In the beginning I want to state that the caustic remarks of appellant's counsel in the motion for rehearing are wholly uncalled for. In the motion for a new trial, and in the brief, it was contended: "The defendant prays the court to grant her a new trial herein because the verdict of the jury is contrary to the law and the evidence in this: That the great weight of the testimony in this case shows clearly and conclusively that the defendant, Minnie Latham, when she shot the deceased, John Y. Stewart, shot in her own self-defense, and this testimony of the witnesses is supported and confirmed by the course of the wounds in the body of said John Y. Stewart which show conclusively that the deceased could not have been shot from behind while sitting down on the sidewalk as sworn to by one of the State's witnesses; that all of the testimony in this case with the exception of three witnesses shows conclusively that the deceased, John Y. Stewart, was standing up on the sidewalk when he was shot and was not sitting down."

In the motion for rehearing in this court there are but four grounds assigned, three of them being the grounds upon which Judge Davidson dissented, and the fourth being: "Appellant would show to the court that this court erred in overruling appellant's assignment in her motion for a new trial, wherein she alleged that the evidence was insufficient upon which to justify and sustain a conviction. The court overruled said assignment and upon doing so the majority opinion makes a large summary of the evidence in the case. None of the testimony of appellant and none of the testimony of appellant's witnesses are included in said summary, but, upon the contrary, a summary of the State's testimony alone is included in the opinion and the deductions drawn are the strongest that could possibly have been made under any phase of the testimony of any of the witnesses."

Thus it is seen that the proposition was presented that the evidence would not sustain the verdict. Counsel evidently overlook the fact that in passing on the sufficiency of the testimony to sustain a finding of the jury—the verdict—that it is the duty of this court to take the evidence offered in behalf of the State, and look to that to see whether or not, if the jury find it to be true, it will sustain their finding. In passing on whether or not a certain issue is raised, when an appellant contends it was, we look to the testimony offered by appellant, and state the evidence as contended by appellant. We have, as stated, re-read the entire record, and are of the opinion that the evidence offered by the State authorized a finding by the jury of the issues as stated by Presiding Judge Prendergast, and that counsel's criticisms are unwarranted, and evidently made in the heat of passion. We can understand that counsel may become thoroughly convinced that the version of their client presents the correct theory, but this belief of theirs is not binding upon the jury, and should not and will not be binding on this court. In the original opinion nothing was stated as facts, but it was merely stated that the jury under the evidence was authorized to conclude and find the facts as stated, and we again so state, and overrule this ground of the motion for rehearing.

It is next contended that we erred in holding that the court did not err in permitting the hotel register to be introduced in evidence. We adhere to the ruling made on this issue. The State desired, in making its case, to prove that when appellant went to Snyder she registered at the hotel under an assumed name—Mrs. C. C. Everts. That it was permissible to prove this fact is not questioned by appellant. Now what would be the best or primary evidence that she had registered under the name of Mrs. C. C. Everts? There can be no question that the register of the hotel would be the best evidence of that fact. This, as we understand the record, is not denied by appellant, but appellant contends that as she was willing to permit that fact to be proven by secondary evidence, it was error to permit the State to prove that the primary or best evidence had been destroyed before offering secondary evidence to prove that fact. Had the defendant objected to this secondary evidence, there can be no question that the State would have been required to prove the loss or destruction of the primary evidence (the register) before the secondary evidence would have been admissible. Wharton's Crim. Ev., sec. 198b, says: "The fundamental rule underlying all legal proceedings is that the best evidence of which the case is capable must be first produced." This rule is approved by this court in Porter v. State, 1 Texas Crim. App., 394, quoting from 1 Greenleaf on Ev., sec. 82. Mr. Wharton also says: "The facts concerning the absence of the primary evidence may be shown by parol testimony; parol evidence is admissible to prove the contents of documents that have been lost or destroyed, it having been first made to appear to the court that such documents existed, and that efforts have been made in good faith to produce them in court." Sager v. State, 11 Texas Crim. App., 110; Haun v. State, 13 Texas Crim. App., 383. In this latter case the question is discussed

and authorities cited, and we think this rule not only is established by all the decisions of this court, but by all elementary writers as well. Appellant, as we understand it, does not question this rule, but claims as she was willing to admit the secondary evidence without proof of the destruction of the primary evidence, that the State ought not to have been permitted to prove its destruction. Admissions of counsel do not always bind a defendant, as shown by a number of decisions of this court. (Nells v. State, 2 Texas, 281; Bell v. State, 2 Texas Crim. App., 215; Clayton v. State, 4 Texas Crim. App., 515; Murnutt v. State, 68 S. W. Rep., 634.) While we would not question the fact that the able counsel representing appellant would have lived up to the agreement in this case, yet in the past, in certain other cases, after conviction, new counsel has been employed who did raise such questions, and we have felt impelled to reverse the cases as shown by the above cited cases. And if counsel for the State did not care to rely on the admission or agreement of counsel for the defendant in this case, but preferred to show the destruction of the primary evidence to render admissible their secondary evidence of this fact, the State certainly had the right to do so, and the court did not err in so holding. The fact that State's counsel did not desire to prejudice defendant by making such proof is evidenced by the record, for they stated in the presence of the jury that they could not and did not seek to connect her with the destruction of the record, and the further fact that when appellant voluntarily took the stand and admitted that she had registered at the hotel under the name of Mrs. C. C. Everts, the State agreed that the court should instruct the jury not to consider the evidence adduced of the name being erased from the register. The evidence being admissible there was no error in admitting it, and certainly none in permitting it to be withdrawn as it was legitimately and legally in evidence. The fact that such evidence was hurtful to defendant would not render it inadmissible. All evidence offered in behalf of the State will more or less have that effect.

In another ground it is claimed that the court erred in holding there was no error in permitting the cross-examination of the witness Joe Lockwood, it being contended that such cross-examination tended to impair the credit to be given the testimony of the witness introduced in behalf of defendant. What is a cross-examination for but to test the credibility to be given the testimony of a witness? The testimony of this witness shows that he voluntarily went to defendant's counsel and informed them of the facts he could and would testify to in behalf of appellant, and it is complained that the court erred in permitting it to be shown that he did not voluntarily also go to State's counsel and tell them what his testimony would be. This fact would clearly show the interest and bias of the witness, and there was no error in admitting it. Earle v. State, 64 Texas Crim. Rep., 537, 142 S. W. Rep., 1181; Pope v. State, 65 Texas Crim. Rep., 51, 143 S. W. Rep., 611, and authorities there cited. See also Branch's Crim. Law, sec. 861, where the rule is stated to be, that the interest or bias of a witness is never a collateral or

irrelevant inquiry, but may always be shown. In this case when it appeared that the witness had voluntarily gone to defendant's counsel and told them what his testimony would be, the fact that he had not gone to State's counsel also and told them would clearly tend to show the interest he felt in defendant, and his bias in her favor. Appellant cites us to the case of Roberts v. State, 70 Texas Crim. Rep., 297, 156 S. W. Rep., 651, and cases there cited as sustaining his contention. But by a careful and thoughtful reading of those cases it will be seen that the testimony objected to was sought to be introduced in those cases to impeach the witness—the testimony offered would not and did not tend to show the interest and bias of the witness. In this case the testimony was not offered to impeach the witness, nor would the testimony adduced have that effect, but it was offered and introduced to show the interest Lockwood had in the case, and his bias in her favor, and it would have a tendency to so show, and it was admissible for that purpose, and this ruling in nowise conflicts with the holding in the Roberts case, supra, and other cases cited in that opinion and relied on by appellant.

The only remaining question assigned in appellant's motion for a rehearing relates to the exclusion of the testimony of the witness Sterling Bynum. This witness testified that he was coming up the street going east, when he saw deceased on the sidewalk just ahead of him; that witness was some fifteen or twenty steps behind him. He then says: "The first thing that I saw, I saw this woman raise her veil with her left hand, and then at that time she was pulling the gun out and he throwed his hand up, his left hand up that way (indicating). He had his hands in front of him like this and he was either at the time whittling or cleaning his finger nails; he throwed this left hand up and dropped his right hand down and when this hand got to about there, it looked like, then the gun fired. Yes, sir; he threw his right hand down. He throwed his right hand down to about his belt, that is where he had his right hand at when he started falling. As to which I saw the first, the man's hand dropping to his side or the lady drawing the gun, will say that they both happened at the same time. Yes, sir; that man that got shot was walking on the sidewalk there, he was not sitting down on the sidewalk at all. Right after the shooting this man that was shot stumbled off of the sidewalk, and fell down or around someone and caught around their legs and she shot him then a time or two again. When he made the motion up with his left hand like I have indicated there was a knife in his left hand, right at the time of the shooting. I would think that the woman and the man at that time were something like three or four feet apart; about that close together when the knife went up in the left hand. The knife when I noticed it in his left hand was open, and I did see the blade of the knife as he threw his left hand out. Yes, sir; at the time of the first shot the lady was nearer to the building there than the man. I could not say just how close that knife would come to that woman when he threw his hand out

that way with the knife in it; but I would think that the knife come pretty close to her."

This testimony was very material to her defense—that she shot deceased in self-defense. The testimony was admitted without question, but when the defendant desired to go further and ask the witness, after he had testified "he (deceased) threw his right hand down"—"What did you think he was doing with his right hand?" This question was objected to, and the objection sustained. The bill further shows that the witness would have answered, if permitted to do so, "that the act and conduct of deceased made the impression on his mind that the deceased was attempting to draw a pistol." The admissibility of this latter statement has given us much serious thought and consideration. If admissible, its rejection was seriously harmful to defendant. She testified that her husband had told her that he could not live with her longer, and they were on their way to Colorado City, and when they arrived there their separation was to be permanent, and the ground upon which he was quitting her was the conduct of herself and deceased; that he, apparently, believed their conduct had been seriously improper. This she denied, and said that in going through Snyder she thought she saw deceased, and got out of the automobile and stopped over there to get the compromising letters she had written, and get a statement from deceased that no improper relations had existed between them. That she did not tell her husband her reason for stopping at Snyder, but told him as he had decided to quit her, he could have no interest in where she stopped; that she did stop at Snyder to see deceased, but not for the purpose of killing him, but to get the letters, and a statement exonerating her from immoral conduct; this statement she desired to get to show her husband. She admits she was there waiting to see deceased, and when she saw him, she went to him with the intention of demanding the letters and securing the statement; that he came meeting her, and then to quote her own language she testified: "Before he got in ten feet of me, I spoke to him. I first said, 'Good morning.' He didn't speak, he just gazed me right in the fact, he did not speak. And I spoke again and he snarled at me and turned his head off to one side. I then asked him to stop and he walked on like he didn't hear me. But he had a knife in his hand and he had the knife in his hand when he crossed the street,—I noticed it directly after he got into the street on the other side. I do not know whether he had it in his hand all of the time or not, but I noticed at first it was in his right hand. When he got within about ten feet of me, I asked him to stop, after I had spoke to him twice and he had refused me. I intended then to get those letters and to get a statement from him to give to my husband, and he refused to stop. About the same time he changed his knife from his right hand to his left, and he dropped his right hand on his gun. I drew my gun. I thought he first intended to use the knife. I then shot him. I do not know, sir, how many times I shot him, my mind is a blank from then on, until I found myself in the sheriff's office. I do not know how many times I shot, it might have been a dozen for

all that I know. I do not remember anything else about the shooting,
I was scared at the time; I know that he intended to do something rash,—
and, if he didn't, why did he throw that knife out towards me and put
his hand on his gun,—why did he do all of that? As to whether I
thought he was going to hurt me, will say that I knew that he was,—
I could not help but think it. Yes, when I spoke, he snarled. Yes,
sir; as a matter of fact I did think that John Stewart was going to
kill me."

It is thus seen that appellant testified that as deceased approached
her he dropped his hand on his gun, and it created the impression on
her mind that deceased was going to kill her.

Now, if it was permissible for a bystander to state that the acts and
conduct of deceased created the impression on his mind that deceased
was attempting to draw a pistol, its materiality is apparent, for such a
statement would strongly corroborate her testimony, and support her
plea that she acted upon the reasonable appearance of danger to herself.
The verdict of the jury manifests that they believed that the mind of
appellant was agitated and rendered incapable of cool reflection by the
acts of deceased at the time, viewed in the light of his previous conduct,
but they did not believe that his acts and conduct were such as to cause
her to believe that she was in danger of losing her life or suffering some
serious bodily harm.

It is contended by the State that it is the impression made on the
mind of defendant that would justify her in shooting, and not the im-
pression made on the mind of a bystander or any other person other
than appellant. This is undoubtedly the law, and this is the view we
took of the case in rendering the original opinion. And right here the
writer desires to state that he is as much responsible for this holding
in the original opinion as any other member of the court, and that was
his view of the question and opinion at the time of the handing down
of the original opinion. However, owing to the earnest insistence of
counsel for appellant, we have again reviewed this question, and the
writer is frank to admit that he is not now so thoroughly convinced that
he was right in the original holding. Of course, it is from the view-
point of defendant, as the circumstances appeared to her, she must be
judged, and the impression made on any other person would furnish
her no defense. This has been held too often to need a citation of
authorities. But when she has testified that from the acts and conduct
of deceased at the time she thought he was in the act of drawing a
pistol, and that her life was in danger, can her testimony be supported
by the testimony of bystanders that the acts and conduct of deceased
created the impression on their minds that he was about to draw a
pistol? If so, such testimony coming from, apparently, a wholly dis-
interested source, would have much greater weight and be given more
consideration by the jury than when it came from the mouth of the
defendant alone. It is contended by the State that such testimony is
merely the opinion of the witness, and that opinion testimony is inad-
missible, coming from this source on such an issue. Granted, that mere

opinion testimony is inadmissible, for it is doubtless true, and the law. But is such testimony merely the opinion of the witness and no more? He would testify that he saw the acts and conduct of the deceased, and such acts and conduct created an instantaneous impression on his mind, and he would testify to what that impression was. Of course, that part of the court's qualification of the bill, "that he was of the opinion that the witness was not in position to give an expression," would go to the weight to be given the testimony and not to its admissibility, and the weight to be given testimony is always a question for the jury trying the case and not for the trial judge. Our Constitution guarantees a trial by jury in all felony cases, and under our procedure the jury is made the judges of the facts proved, the credibility of the witnesses, and the weight to be given the testimony, and under the circumstances attendant upon the case though a judge may believe that no jury would be authorized to give credence to the testimony, yet if a witness is willing to swear to an admissible fact as if within his knowledge, the fact that the judge does not believe the testimony to be true does not authorize him to reject the testimony for that reason alone.

However, the writer would have been inclined to adhere to the original opinion, but for several opinions of this court which are called to our attention and lead us to make a thorough investigation of the authorities. We do not think anyone would concede or hold, that where a person on trial testified to facts showing self-defense as it reasonably appeared to him at the time, it would be permissible for the State to call its witnesses and have them testify that from the acts and conduct of deceased at the time it did appear to them that deceased was about to kill the defendant or do him some serious bodily injury—that no such an impression was made on their minds. Such testimony would be an opinion pure and simple. And if the State can not meet the testimony of a defendant with this character of testimony, it may be contended that the defendant can not strengthen her defense with the same character of testimony and if it be held to be a mere opinion only, doubtless it would be inadmissible. But it seems that the question of the admissibility of this character of testimony in behalf of the defendant has been before this court on several different occasions, and it has been held admissible. In the case of Thomas v. State, 40 Texas, 36, when our Supreme Court had jurisdiction in criminal matters, it was held, "Where a bystander had grabbed the arm of the assaulted party, he was permitted to testify why he did so,—that he 'thought Wren (the assaulted party) was going to strike with the tumbler.' This may be deemed strictly an expression of opinion, but it is such an one, arising at the instant, in view of all the circumstances, inducing an act by the witness as may more properly be considered a fact, part of the transaction illustrating the effect likely to be produced by Wren's conduct and manner, which could not be fully expressed and explained in words to the jury. The effect produced on a bystander by the conduct of Wren would illustrate the effect likely to be produced on the mind of the party himself, and we can perceive no good reason why it should not have been allowed."

In Cochran v. State, 28 Texas Crim. App., 422, this court, speaking through Presiding Judge White, held: "Defendant offered to prove by the witness Wilshire, who was standing just to the left of defendant immediately before the shots were fired, that 'the reason he (witness) passed from defendant's left side around behind his back to his right side, was that he (witness) expected that deceased would strike at defendant with that billiard cue, and that he feared deceased might miss defendant and hit him.'

"An analogous question is discussed in Thomas v. State, 40 Texas, 36, and it was held that such character of evidence was admissible, as tending to explain the effect the acts of the party would likely have produced upon the accused. It was said that 'the effect produced on a bystander by the conduct of the party would illustrate the effect likely to be produced on the mind of the accused himself, and we can perceive no good reason why it should not have been allowed.' · It was error to reject the evidence."

In the case of Harrison v. State, 25 S. W. Rep., 284, this court held: "Upon the trial the State proved (appellant objecting) that Bob Pierce struck appellant over the head with a chair. Pierce was asked why he struck him, and he answered that he thought that the defendant intended to kill Joe Thomas with the pistol which he was drawing from his pocket, and that he struck him to prevent the killing, etc. The objection was that this called for the opinion of Pierce, and was therefore not admissible. Under the circumstances of this case, we believe the evidence competent."

In the case of Navarro v. State, 24 Texas Crim. App., 378, 6 S. W. Rep., 542, this court, speaking through Judge Hurt, said: "Assuredly, if one receive a blow which leaves an immediate marked impress, that is appreciable by the senses of him who receives it, or that is in a like manner made sensible to bystanders, neither the injured party nor the onlooker need be an expert to qualify him to testify that the injury was the result of the blow given."

Mr. Wharton, in his work on Criminal Law, says: "Impressions which are primary and for which no substituted proof is conceivable, can be put in evidence, whereas an impression which is merely a secondary idea of that of which a more accurate idea is obtainable can not be received."

We were at first inclined to think that the impression made on the witness' mind belongs to the second class and not the first class named by Mr. Wharton. The witness should be permitted to detail the acts of deceased, that he threw his left hand up with a knife in it, and dropped his right hand to his side, and leave the impression these acts would make to be deduced by the jury, but our court seems heretofore to have held otherwise, and hold that such instantaneous impressions made in one's mind by the acts and conduct, came within the first class mentioned by Mr. Wharton, and was a fact and not an opinion. Mr. Wharton, in his work on Criminal Evidence, speaking of this court's rule in regard to such testimony, says: "The Court of Criminal Appeals

of Texas has so far departed from the definition in its admission of all facts, circumstances, statements, occurrences, before, accompanying, and after, that, as illustrating the rule, the case would be of no value as to the limits set for *res gestae*. This court is unquestionably the ablest criminal court in the United States, and its practice as to res gestae is readily explained from the fact that the Texas Court of Criminal Appeals always considers the entire record, weighing, analyzing, and thoroughly digesting all the evidence before applying the law to the case in hand, and hence admissions as res gestae in the Texas court are not so harmful an application of the rules of evidence as in courts less painstaking with examination of records, and who dwell more upon the strict rules of law." For a list of cases cited, see note 506, page 498, of that work, 10th ed. The rule in this court to permit the witness to depict the scene of a homicide to the jury—to let them see it as it occurred as near as possible, has the approval of a number of authorities.

To the writer's mind, to carry the rule to admit the impressions made on a bystander by the acts and conduct of deceased is extending this rule to the limit, but such rule has the support of eminent authority. In McKelvey on Evidence, section 132, it is said:

"The instantaneous conclusions of the mind as to the appearance, condition, or mental or physical state of persons, animals, and things, derived from observation of a variety of facts presented to the senses at one and the same time, are, legally speaking, matters of fact, and are admissible in evidence.

"The matters referred to are those of which the mind acquires knowledge by the simultaneous action of several of the senses, so that an impression is produced on the mind which can not be traced to any one fact perceived by a single sense, but a statement of which is nevertheless a statement of a matter of fact. A witness may say that a man appeared intoxicated or angry or pleased. In one sense the statement is a conclusion or opinion of the witness, but in a legal sense, and within the meaning of the phrase, 'matter of fact,' as used in the law of evidence, it is not opinion, but is one of the class of things above mentioned, which are better regarded as matters of fact. The appearance of a man, his actions, his expression, his conversation—a series of things—go to make up the mental picture in the mind of the witness which leads to a knowledge which is as certain, and as much a matter of fact as if he testified, from evidence presented to his eyes, to the color of a person's hair, or any other physical fact of like nature.

"This character of evidence is treated in many of the cases as opinion admitted under exception to the general rule, and in others as matter of fact—'shorthand statement of fact,' as it is called. It seems more accurate to treat it as fact, as it embraces only those impressions which are practically instantaneous, and require no conscious act of judgment in their formation. The evidence is almost universally admitted, and very properly, as it is helpful to the jury, in aiding to a clearer comprehension of the facts," citing a number of authorities.

Mr. Chamberlayne, in his work on the Modern Law of Evidence, sec-

tion 1929, says: "Where the inference is an intuitive one, the mind automatically responding to the stimulus of the sense—impressions, the inference as to mental state is, in main, simply a statement of a *fact*. It is accordingly accepted by judicial administration as a matter of course," citing, among other cases as upholding the text, Powers v. State, 23 Texas Crim. App., 42, wherein it was held:

"After the State's witness Thornton had detailed what he had seen of the origin of the difficulty, between defendant and deceased, to the effect that Powers, defendant, placed his foot on the foot of deceased, and that deceased remarked in an audible voice that might have been heard thirty feet, 'that's my foot you are on,' and then shoved Powers' foot off his, the court, over objections of defendant, permitted counsel for the State to ask the witness: 'What was the manner of defendant when he put his foot on the foot of the deceased? Was it done in a jocular manner, or in an insulting manner?' To which the witness answered: 'From the defendant's not moving his foot from Eubank's foot when Eubank asked him, I regarded it as an insult.' Defendant's objection was that the question called for and elicited simply the opinion of the witness, and that the witness' opinion was not admissible as evidence.

"Mr. Wharton says: 'When we enter upon the discussion of the admissibility of opinion (as evidenced) we strike a topic which is embarrassed by much ambiguity of terms.' . . . 'The true line of distinction is this: An inference necessarily involving certain facts may be stated without the facts, the inference being equivalent to a specification of the facts; but when the facts are not necessarily involved in the inference (e. g., when the inference may be sustained upon either of several distinct phases of fact, neither of which it necessarily involved), then the facts must be stated. In other words, when the opinion is the mere shorthand rendering of the facts, then the opinion can be given, subject to cross-examination as to the facts on which it is based. *A fortiori*, whenever a condition of things is such that it can not be reproduced and made palpable in the concrete to the jury, or when language is not adequate to such realization, then the witness may describe it by its effect upon his mind, even though such effect be opinion.' (Whart., Ev., 2d ed., secs. 509, 510, 511.)

"The same author, in a note to section 512, gives upon this subject nearly the entire opinion in Hardy v. Merrill, 56 New Hampshire, 227, from which we make the following extracts, viz: As a general rule, 'opinions of witnesses derived from observation are admissible in evidence when, from the nature of the subject under investigation, no better evidence can be obtained.' Again, 'in an investigation of mental and psychological condition—because it is impossible to convey to the mind of another any adequate conception of the truth by a recital of visible and tangible appearances; because you can not, from the nature of the case, describe emotions, sentiments and affections which are really too plain to admit of concealment, but at the same time incapable of description—the opinion of the observer is admissible from the neces-

sity of the case, and witnesses are permitted to say of a person, "He seemed to be frightened," "He was greatly excited," "He was angry." All these emotions are expressed to the observer by appearance of the countenance, the eye, and the general manner and bearing of the individual— appearances which are plainly enough recognized by a person of good judgment, but which he can not otherwise communicate than by an expression of results in the shape of an opinion.' (1 Greenl., Ev., 13th ed., sec. 440, and note on p. 494. See, also, Best on Ev., 585; Dill v. State, 6 Texas Crim. App., 113; Richardson v. State, 7 Texas Crim. App., 486; Hardin v. State, 8 Texas Crim. App., 653; Tompkins v. Toland, 46 Texas, 584. See, specially for collation of authorities and an able discussion of the subject, Commonwealth v. Sturtivant, 117 Mass., 122.)"

Wigmore on Evidence says, section 1974: "The opinion rule is often sought to be applied to forbid compendious descriptions of the *appearances external indicating internal states*—for example, whether a person looked sick, or sad, or angry. The exclusionary rulings perhaps abound particularly in absurdities and quibbles—highly fit for cynical amusement, were not the names of truth and justice involved in their consideration. One may wonder how long these solemn farces will be perpetuated in the law."

The evidence desired to be adduced from the witness was that from the acts and conduct of deceased the impression created on his mind at the time was that deceased was attempting to draw a pistol.

We have given the question most thorough investigation, and have concluded that under the rule announced in the Thomas, Cochran, Harrison and Navarro cases, and which is approved in McKelvey on Evidence and other authorities cited, the testimony was admissible, and as it was on a most material issue, its rejection was hurtful and harmful error.

Under such circumstances the writer is of the opinion that the rehearing should be granted, the judgment reversed and the cause remanded.

*Reversed and remanded.*

DAVIDSON, JUDGE.—I concur in reversing on rejection of Bynum's offered evidence. I am of the opinion that the judgment ought to be also reversed with reference to the erasure of the name from the hotel register, and because of bill of exceptions reserved in regard to Lockwood's evidence. I will write on these two questions.

PRENDERGAST, PRESIDING JUDGE (dissenting).—This case is to be reversed on the sole ground that the trial judge refused to permit Sterling Bynum, one of appellant's witnesses, to tell the jury that *he* "thought," or *his* "impression" was, "that the deceased was attempting to draw his pistol"—simply that and nothing more.

Before I wrote the original opinion herein I fully investigated and thoroughly considered the question and the authorities. Since then, I have again done so. This has not changed my opinion, but confirmed it.

The question was fully and accurately given in my original opinion, but I will here again briefly state it.

At the time appellant killed deceased, Bynum knew neither of them, and had nothing whatever to do with either, at the time, before or after the killing, and had absolutely nothing whatever to do with the difficulty between appellant and deceased at the time, before or after the killing, and knew nothing whatever about it. From Bynum's own testimony, deceased was some eighty feet distant, and had his back towards him, so it was physically impossible for Bynum to have seen deceased's right hand before or at the time appellant first shot deceased, and for that reason, if for no other, he should not have been permitted to tell the jury that *he* "thought" deceased "was attempting to draw his pistol," nor should he have been permitted to tell the jury *his* "impression" was, "deceased was attempting to draw his pistol," even though he was ready and willing to so swear. But if he had placed himself where he could have seen deceased's right hand, still he should not have been permitted to tell the jury what *he* "thought" nor what *his* "impression" was. Neither *his* "thought" nor *his* "impression" had anything whatever to do with this case, or any question in it. It was in no way any part of the transaction.

Mr. Wigmore has so clearly and forcibly illustrated and demonstrated this in his recent and most valuable work on Evidence, I will here quote him:

"Such a witness is told by the court: 'That is mere opinion; we want what you *know,* not what you *think* or *believe.*' This is one phrase of contrast which the court might use,—the contest between knowing (i, e., personally observing) and opining (i. e., believing without sufficient observation). But there is another phrase: the judge might say, 'We want not your *opinion;* have you any *facts?* For we can guess and opine as well as you can; tell us facts if you have them.' This demand for 'facts' means, as before, some real or positive grounds of knowledge in the witness. The principle of objection which the judge has in mind is the same in both cases; he will have knowledge, not opinion,—facts, not opinion." (Vol. III, p. 2542.)

Again, on page 2550, he says: "The true theory, then, of the opinion rule, in the sense we are here to use, is simply that of the exclusion of supererogatory evidence. It is not that there is any fault to find with the witness himself or the sufficiency of his sources of knowledge or the positiveness of his impression; but simply that his testimony, otherwise unobjectionable, is not needed, is superfluous. Thus the principle of exclusion is in no sense one of testimonial qualifications, but one of auxiliary policy. The delay and waste avoided might be in a single instance trifling; but its seriousness and its unbearableness can be appreciated if we suppose that there were no evidential limits whatever of the above nature. The time taken in the rehearsal of an interminable multitude of opinion, the confusion of the main issues by an additional mass of testimonial differences and impeachments, and the tendency for the jury now and then to decide simply according to the preponderance

of numbers and of influential names,—all these are possibilities, in the absence of some limit of the present nature."

And on page 2550 he says: "What we have to notice, in inquiring as to the scope and the effect of the principle, is, that it does not employ any mere shibboleth; it does not rest on a simple caprice, prejudice, or tradition; and, most of all, it does not exclude any specific class of witnesses or all testimony on a specific subject. It simply endeavors to save time and avoid confusing testimony by telling the witness: 'The tribunal is on this subject in possession of the same materials of information as yourself; thus, as you can add nothing to our materials for judgment, your further testimony is unnecessary, and merely cumbers the proceedings.' It is this living principle which is (or ought to be) applied in each instance; nothing more definite than this is the test involved by the principle. . . . There is, thus, no special department of knowledge and no fixed formula involved. We are dealing merely with a broad principle that, whenever the point is reached at which the tribunal is being told that which it is itself entirely equipped to determine without the witness' aid on this point, his testimony is superfluous and is to be dispensed with."

In my opinion neither of the cases cited by appellant, and noted by Judge Harper, in his opinion, reversing this case, are in point. Take the Thomas case, 40 Texas, 36. In that case Thomas was indicted and tried for an assault to murder Wren. The court states the evidence:

"The evidence for the State was given by Wren, the party assaulted, and Hix, the bar-keeper, who had witnessed the whole transaction. Their testimony does not materially vary, and was, in substance, that the parties had been on friendly terms; they casually met in the bar-room, and were standing at the bar, leaning against it, with one Morris standing between them. Drinks were called for by Wren, and afterwards accused bantered him to play at cards. He answered, 'Show your money'; to which accused replied, 'I have as much money as you have.' Wren then said, 'I am not going to be made a d—d fool of,' and thereupon the lie was given. Wren says it was first given by accused, but the bar-keeper did not recollect by which; but instantly Wren seized or attempted to seize a glass tumbler, of more than ordinary size, which was on the counter, when his arm was seized by the bar-keeper and firmly held. At the same time accused stepped around Morris, who was between them and, drawing his pistol, fired at Wren, powder-burning his face, drawing blood, and the force of the discharge or shot staggering him to the wall. Just as the accused drew his pistol the bar-keeper let go Wren's arm, because, as he testifies, 'he thought accused was going to strike Wren.' This all occurred very quickly and suddenly. Wren, released by the bar-keeper, instantly seized the tumbler and threw it at accused, and also a bottle." The witness Hix, the bar-keeper, was *an actor* in the fight between Wren and Thomas. He first seized and held Wren's arm to keep him from striking Thomas with a large glass tumbler, but just as Thomas drew his pistol to shoot Wren he let go Wren's arm and it was proper for him to tell why *he acted. It was a*

*part of the transaction*—that "he thought Thomas was going to shoot Wren," showed why *he acted*. What the court decided in that case is very different and inapplicable to the question in this. Besides, even in that case the Supreme Court said the exclusion of that and other evidence, "may not be so material as to require a reversal of the judgment, *and we do not so decide.*"

So in the Cochran case, 28 Texas Crim. App., 422. The report of the case shows that the witness Wilshire was standing right by Cochran when McLennan, whom Cochran killed, and for whom he was on trial for murdering, advanced towards him, "with his left hand held out towards defendant and the billiard cue in his right hand, with big end up, holding it in striking position." This court, in that state of evidence held Wilshire ought to have been permitted to testify: "The reason he (the witness) passed from defendant's left side around behind his back to his right side, was that he (witness) expected that deceased would strike at defendant with that billiard cue, and that he feared deceased might miss defendant and hit him." Thus, Wilshire was *an actor* in the affair, and it was proper under the circumstances to tell why *he acted*. It was part of the transaction.

So in the Harrison case, 25 S. W. Rep., 284, this court held the witness Pierce was correctly permitted to tell he struck Harrison over the head with a chair to prevent Harrison from killing Thomas, for he thought Harrison intended to kill Thomas with the pistol which he was drawing from his pocket. Thus Pierce was *an actor* in the affair, and not a mere bystander, and under the circumstances it was proper to tell what caused *his action*. It was a part of the transaction.

It is useless to take up the other cases. They are all on the same line. None applicable to this case. The reading of the cases and text-books cited by Judge Harper will show they are wholly inapplicable to the question in this case. They are all on a different character of evidence under altogether a different state of facts. A reading of them will demonstrate this.

This case should be affirmed, not reversed. I respectfully dissent.

December 23, 1914.

DAVIDSON, Judge (concurring and partly dissenting).—When the original opinion was handed down by Presiding Judge Prendergast I dissented upon three propositions. On rehearing Judge Harper changed his view in regard to one of them, maintaining the correctness of the original opinion as to the other two propositions. I concur, with Judge Harper in reversing upon the ground stated in his opinion. I disagree with him on the other two propositions, as I did in the original opinion. I am led to believe from reading Judge Harper's opinion that he has decided the question with reference to the erasure of the name on the hotel register from a misconception of the bill of exceptions, and has placed his opinion upon a ground not urged and not presented. Presiding Judge

Prendergast's opinion sets out the bill of exceptions in full. I do not care to repeat it. An inspection of that bill shows that White was introduced by the State and testified that appellant registered at his hotel the night prior to the homicide under the name of Mrs. C. C. Everts. There was no objection to this testimony. It was admitted to be true. The hotel register was offered to prove that that name had been subsequently erased. Objections were urged to its admission. It was also shown in the bill that prior to the erasure of the name State's counsel had had the register photographed and used this photographic copy as evidence. Appellant urged no objection to that evidence. It was a photographic copy before the erasure occurred. Judge Harper, as I understand his opinion, holds the erasure was legitimate, and that the introduction of the register showing that fact was the best evidence. Appellant objected to its introduction for various reasons, but not that the register was the best evidence. The register was not offered to show the original entry or that appellant wrote the name Everts on the book. It was offered and admitted to show the original entry had been erased. It was not permissible under the bill to introduce evidence to show the erasure. It was admitted by Mr. Higgins, State's counsel, that appellant could not be connected with that erasure. The book was offered only for the purpose of showing the erasure. Appellant was in jail at the time of the erasure on a charge of having killed the deceased. Counsel for appellant at no time insisted that the register should be introduced for any purpose. They were urging it should not be, because it showed the erasure of the name, and appellant did not urge it was the best evidence to prove anything, but insisted it was not. As before stated, the State proved without objection the fact that the name had been registered. Appellant admitted she had so registered. Photographic copies so showed. If appellant had insisted that the register was the best evidence of the fact that Mrs. C. C. Everts had so registered, it might have been some excuse for Judge Harper's statements that it was the best evidence, but no such objection was urged and no such question raised. The rule of the best evidence is only urged when secondary evidence is offered. The register, whether or not tampered with, could not be any evidence of the fact that Mrs. Everts (appellant) under the name of Mrs. Everts, wrote that name. The register could only show the mere fact that the name "Mrs. C. C. Everts" was written on the register. The register could not prove or tend to prove that appellant placed it there. That must be done by other testimony showing that she wrote the name. White testified to this without objection. The best evidence of the fact was that to come from those who saw her write the name. Her admission could be used to prove it also. The register could not prove that she wrote the name.

The court should have sustained appellant's objections, especially in view of the statement of Mr. Higgins, who prosecuted for the State, that appellant had nothing to do with the erasure and could not be connected with it. When that statement was made all objections should

have been sustained. The evidence ought not to have gone to the jury at any time. Mr. Higgins made a second admission of error. After the evidence had been before the jury for some time, until the following day it seems, he asked its withdrawal because of its inadmissibility. Upon this last statement the court withdrew the testimony from the jury. Presiding Judge Prendergast says if this was error it was harmless. Fabrication or destruction of testimony of a criminative nature is not and can not be harmless. The erasure, if by appellant, strengthens the State's case; if not by her or her connivance, it was materially damaging. Under all the authorities this testimony was so clearly inadmissible it is not subject to debate. For collation of authorities see Branch's Crim. Law, sec. 862. He thus states the proposition: "Defendant is not bound by, and it is error to prove the efforts of his friends, relatives or attorneys to induce a witness to leave, or suppress or manufacture testimony, or compromise the case, unless it be shown that defendant was connected with or authorized the efforts to tamper with the witness." Then follows a great number of cases. It is further laid down as the rule, that "where the proof of tampering with the witness would not be admissible as original evidence, it is also inadmissible for impeachment, and error in admitting it is not cured by limiting it to impeachment." I do not care to follow this further.

With reference to the witness Lockwood, I think my brethren are in error. In substance, it is shown Lockwood was introduced as a witness for the defendant. On cross-examination the State, among other things, asked him if he told anybody what he knew of the case. He stated that he had mentioned the matter to Mr. Payne, his attorney in another case. Payne was also one of appellant's attorneys. Without going into details as to how the conversation between Lockwood and Mr. Payne occurred, suffice it to say that he testified to this conversation only at the instance of the State on cross-examination. The State was further permitted to prove by this witness that he, witness, had not gone to Mr. Higgins, counsel for the State, and told him what he knew of the facts. The same attorney was permitted further to draw from the witness the fact that he had not gone around over the county and told the people generally about the matter. Without further detail, the witness was required to testify that he had not told anybody about his knowledge of the facts of the case, except Mr. Payne. Presiding Judge Prendergast and Judge Harper seem to think that this is admissible on the question of bias and motive. I do not care to discuss this matter. The whole matter was adjudicated after thorough consideration in Roberts v. State, 70 Texas Crim. Rep., 297, 156 S. W. Rep., 651. The cases and the questions are so very similar it is sufficient to refer to that as being a late case on that question by this court. It is directly in point, and covers the question. The Roberts opinion is in line with and cites other authorities. Why this should be used to discredit the witness is not apparent, and is not supported by any cases called to my attention. Bias is but a mode of discrediting the witness.

In closing, I wish to say I concur in reversing the case on the ground

stated by Judge Harper, and under all the authorities that have been called to my attention the case should have been reversed on the other two propositions above discussed.

I therefore concur in the reversal of the judgment, but dissent from the views of the majority holding that the other two questions were not erroneous.